Filed 4/10/2017

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL TOVAR,<br><br>     Defendant and Appellant. | A145498<br><br>(Alameda County<br>Super. Ct. No. H53333A) |

A jury convicted defendant Rafael Tovar of first degree murder and conspiracy to commit murder based on his participation in the 2010 killing of Justice Afoa. Tovar's sole contention on appeal is that insufficient evidence supports the jury's finding that he committed the conspiracy offense "for the benefit of, at the direction of, or in association with [a] criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" (Pen. Code,[1] § 186.22, subd. (b)), which we will refer to as the gang enhancement. We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

*A.    The Murder.*

During the fall of 2010, members of the Newark Memorial High School football team were involved in an ongoing conflict with other students affiliated with local Norteño street gangs. That September, Justice Afoa, one of the football players, and some teammates went to Tovar's home at the invitation of Tovar's younger sister,

---

[1] All further statutory references are to the Penal Code.

Daniela Guzman.[2]  When the group arrived, Guzman was not there, but Tovar, who was drunk, came outside.

Tovar was 29 years old at the time, and he was a self-admitted member of FMT (Fremont Mexican Territory), an East Bay Norteño gang.  He was angry that one of the football players in Afoa's group, Anthony J., was there, because he believed Anthony J. had mistreated Guzman during a previous dating relationship.  Tovar and Anthony J. began fighting, and Afoa stepped between them, "trying to hold [Tovar] back and [to] just tell [Tovar] to chill out."  Tovar responded by punching Afoa in the face, and Afoa punched him back.  Another football player then approached and punched Tovar, knocking him to the ground.  The football players left, and Tovar was eventually taken to the hospital with a concussion and "nose trauma."

The next day, Tovar's cousin, also a Norteño gang member, called Tovar's house from prison and spoke to Tovar, Guzman, and their younger sister.  The younger sister indicated that she was trying to get the addresses of the football players.  Referring to Daniel Howard, Tovar's longtime friend and a fellow gang member, she confirmed that "Danny Howard and JD" were "on it" and reported that Howard had said, "[W]e already got boys."[3]  Guzman also said she wanted to retaliate for Tovar's beating.  After Tovar and the cousin discussed the beating, the cousin asked whether "everything [was] good" and whether Tovar and Howard were "going to take care of that."  Tovar responded, "Yeah, it's all good."

---

[2] Guzman's appeal from her convictions based on her involvement in Afoa's death is currently pending in this division.  (*People v. Guzman*, A146386.)

[3] Howard was convicted of first degree murder and conspiracy to commit murder in connection with Afoa's death.  In a previous nonpublished opinion, we reversed those convictions due to instructional errors, but we upheld other convictions for unrelated offenses.  (*People v. Howard* (Nov. 30, 2015, A139179).)

Over the next few months, Guzman and Howard exchanged several text messages in which Guzman reported on Afoa's movements.[4]  In late October, Guzman sent a text message to Howard that stated, "Justice is at a party that I'm at right now!!"  Later that night, a friend of Afoa's was driving when he saw Afoa running down the street away from a Halloween party.  After the friend picked up Afoa, he noticed that Afoa was hurt and transported him to the hospital.[5]  Soon afterward, Guzman sent text messages bragging that Tovar was going to kill Afoa because Tovar was "a real OG" (original gangster).

On the afternoon of December 15, 2010, Afoa was stabbed to death on the street near Tovar's home.  Two years later, Tovar, Guzman, and Howard were arrested for the murder.  Tovar admitted to killing Afoa during a police interview, and a recording of this interview was played for the jury.  Tovar also testified at trial.

Tovar explained that he and Guzman were driving when Guzman noticed Afoa walking down the street.  Tovar called Howard to say he had seen Afoa, and Howard arrived at Tovar's house about 10 minutes later.  Tovar grabbed a kitchen knife, and the two men drove away in Howard's car.  They quickly located Afoa, parked, and hid behind a wall.  As Afoa approached, Howard emerged from behind the wall and said, "Do you know what time it is?"  Afoa began running, and Howard and Tovar chased him down and attacked him.[6]

---

[4] We will assume that the person to whom a cell phone was registered was the person using it at any given time, although we recognize that cell phone records do not definitively establish the identity of a phone's user.

[5] There is some implication in the record that another cousin of Tovar's who was a Norteño gang member was involved in attacking Afoa at the Halloween party, but it is unclear what actually happened.

[6] Tovar admitted to stabbing Afoa but claimed not to know whether Howard also had a weapon.  A witness to the murder saw Tovar and Howard "punching" Afoa but did not see any weapons.  The forensic pathologist who performed Afoa's autopsy testified that Afoa's wounds were caused by both "a sharp instrument" and "a dull instrument" that could have been a dull knife, a screwdriver, or another tool.

Tovar claimed that a few days before the murder he learned that Afoa had "backhanded" Guzman at a party. Tovar said he did not intend to kill Afoa but wanted only to beat him up in retaliation for "putting hands on" Guzman. In explaining why he had taken a knife with him if he did not intend to kill Afoa, Tovar said Afoa was larger than he was and he did not want to lose a fight again. Tovar also claimed that he had been stabbed before and had not died, so he did not think stabbing Afoa would necessarily result in death.

Tovar denied participating in any plan to attack Afoa or having a gang-related motive for the murder. Tovar was aware that while he was in the hospital "[t]here was a meeting that was called to retaliate on . . . the people who" had assaulted him. Although he did not know who had attended, "anybody who was close to [him]" would have been at the meeting, and "it was considered a gang thing." Tovar claimed that he had reacted to news of the meeting by discouraging any retaliation, however, because he was "going to be the first guy [the police were] going to come after" if anything happened. Indeed, he testified that he specifically told Howard that "nothing better ever happen to these guys," referring to Anthony J., Afoa, and two of the other football players, and that he also specifically told Guzman he did not "want anything happening to any of these people." Tovar denied knowing that Guzman and Howard had been communicating in the months before the murder about retaliating against Afoa, and he denied playing any role in the attack on Afoa at the Halloween party. Tovar did, however, admit to feeling good at the time of the murder about "getting a little bit of pay back" for the football players' assault.

   B.   *Gang Evidence.*

Officer Andrew Gannam, a former detective with the Union City Police Department, testified as a gang expert. He explained that Norteños are "street gang member[s] from a predominantly Hispanic gang in Northern California who [are] loyal to their specific gang" in their city but also act as "foot soldiers" for Nuestra Familia, a prison gang "that is supposed to basically run the activities of Norteño street gangs."

4

Officer Gannam testified that FMT is a local Norteño gang of approximately 450 members that "claim the city of Fremont as their territory" and are also loyal to Nuestra Familia. FMT does not have a "set hierarchy," but members "who have committed violent crimes for the gang, have been to prison, [or] are active gang members who are out there . . . a fair amount doing gang[-]related crimes" are perceived as "higher gang member[s]," or OGs. FMT has "a lot of the same signs and symbols of Norteño gangs throughout Northern California," including forms of the number 14 (because "N" is the fourteenth letter of the alphabet) and the color red. Officer Gannam testified that FMT's primary activities include assault, robbery, and murder, and the prosecution introduced evidence that FMT members had assault convictions.

Officer Gannam opined, and Tovar conceded, that Tovar was an active member of FMT at the time of Afoa's murder. Tovar had a gang moniker, "Payaso"; had several gang-related tattoos, including "East Bay FMT XIV" across his knees and "FMT" on his finger; had been arrested for gang-related crimes; had been seen wearing gang-related clothing; and had associated with other known gang members. In 2008, Tovar was found with a drawing that had Norteño-related symbols on it and said "Death B4 Dishonor," which Officer Gannam characterized as "a highly gang[-]related phrase" that "Norteño gangs within the East Bay use" to highlight the importance of respect. The officer explained, "To be disrespected or dishonored is a huge thing within the Norteño gang world. Respect is one of the few things that they cherish and that they hold high. . . . [¶] . . . And as the drawing says, they'd rather die than be dishonored."

Officer Gannam also opined that Howard was "a Norteño gang member" at the time of Afoa's murder. Howard had gang-related tattoos, including "Bay Area Warrior" and a Huelga bird (a common Norteño symbol) on his chest and "East Bay" and "Fremont" on his back. In regard to the latter tattoo, Officer Gannam explained that "Fremont is the city that [Howard's] gang claims as [its] territory." Howard and Tovar had also been stopped together, which Officer Gannam considered evidence of Howard's gang association, and had fought "some rival Sureño members" in 2001.

5

Finally, Officer Gannam opined that Afoa's murder was gang-related.  In response to the prosecutor's question based on a hypothetical set of facts, Officer Gannam testified that if an OG was "beaten up by a much younger rival or considered rival," the OG's "level of respect would drop significantly, and overall, the level of respect for the gang would drop significantly as well."  The officer explained,

> "The East Bay Norteño gangs, for the most part, are very closely ali[g]ned.
>
> Word travels fast amongst them, and . . . you know, something happens in Newark to a Norteño gang member, the guys from Hayward know about it almost immediately, the guys from Newark, Fremont, Union City, everybody kind of knows.  There's a lot of family ties amongst the gangs, and a lot of them know each other and function together.
>
> So for this older guy with a little bit of respect to be attacked and lose in this fight, it's a significant slight to his respect and his gang's respect as a whole[.] . . .
>
> . . . Other Norteño gangs from the area are going to say what's going on with whatever gang this is, because [its] more respect[ed] guys are getting their business handled on the street, and [its] reputation level as a whole is going to kind of fall."

Thus, Officer Gannam agreed with the prosecutor that if "an OG . . . is beaten up by a rival, and one day he and another gangster find that individual and assault and kill that person," the crime would "be for the benefit of the gang."  The officer explained that in particular, by retaliating for an assault by committing murder, the gang member would demonstrate to rivals that "that gang . . . is serious and not to be messed around with" and to other Norteño gang members that "hey, we can count on these guys, because this is what they do.  They don't mess around.  They get disrespected and the answer is extreme violence."  Officer Gannam also found it significant that a memorial at the site where Afoa died was defaced with "XIV" markings, because it suggested that Afoa "was murdered by Norteños for Norteños."

6

*C.*    *Verdict and Sentencing.*

The jury convicted Tovar of one count of first degree murder and one count of conspiracy to commit murder.[7]  The jury also found true the allegation that he personally used a deadly or dangerous weapon during the murder and the gang-enhancement allegation accompanying the conspiracy count, but it found not true the gang-enhancement allegation accompanying the murder count.[8]

After the trial court found that Tovar had suffered five prior convictions, it sentenced him to prison for a total term of 29 years to life, composed of a term of 25 years to life for the murder, a concurrent term of 25 years to life for the conspiracy to commit murder, and consecutive terms of one year for the personal use of a weapon and one year each for three of the prior convictions.[9]

II.

DISCUSSION

*A.*    *General Legal Standards.*

Section 186.22, subdivision (b) imposes "a sentencing enhancement on those who commit felonies 'for the benefit of, at the direction of, or in association with any criminal street gang.' [Citation.]  A criminal street gang, in turn, is defined . . . as any 'ongoing organization, association, or group of three or more persons' that shares a common name or common identifying symbol; that has as one of its 'primary activities' the commission of certain enumerated offenses; and 'whose members individually or collectively' have

---

[7] Tovar was convicted under sections 187, subdivision (a) (murder) and 182 (conspiracy to commit murder).

[8] The personal-use allegation was made under section 12022, subdivision (b), and the gang-enhancement allegations were made under section 186.22, subdivision (b).

[9] The trial court imposed and stayed one-year terms for the other two prior convictions.  It found all five prior convictions true under section 667.5, subdivision (b). Tovar's sentence does not reflect the gang enhancement at issue because section 186.22, subdivision (b) provides that when the underlying conviction is for "a felony punishable by imprisonment in the state prison for life," a defendant who violates the statute "shall not be paroled until a minimum of 15 calendar years have been served" (§ 186.22, subd. (b)(1), (5)), and the term imposed for the conspiracy conviction was already 25 years to life in prison.

committed or attempted to commit certain predicate offenses." (*People v. Prunty* (2015) 62 Cal.4th 59, 67 (*Prunty*), fn. and italics omitted.) To prove this sentencing enhancement by showing that the defendant intended to benefit a gang, the prosecution must establish not only the existence of a "criminal street gang" but also "that the defendant sought to benefit that particular gang when committing the underlying felony." (*Ibid.*)

To determine whether there is sufficient evidence to support a sentencing enhancement, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

   B. *Sufficient Evidence Supports the Gang Enhancement.*

Tovar claims the gang enhancement lacked substantial evidence and must be reversed. We are not persuaded.

Tovar apparently concedes that there was sufficient evidence both that he conspired to murder Afoa for the benefit of or in association with "the larger Norteño gang" and that FMT met the definition of a "criminal street gang" under section 186.22, subdivision (f). He argues that substantial evidence to support the gang enhancement was nevertheless lacking because the prosecution failed to show a connection between the gang subset (here, FMT) and the larger umbrella gang (here, the Norteños), as discussed in *Prunty, supra*, 62 Cal.4th 59. In particular, he relies on *Prunty*'s holding that "when the prosecution seeks to prove . . . a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection

8

between the gang and the subsets." (*Id.* at pp. 67-68.) *Prunty* also explained, however, that this holding is inapplicable "when a defendant commits a crime to benefit a particular subset, and the prosecution can show that the subset in question satisfies the primary activities and predicate offense requirements, [because] there will be no need to link together the activities of various alleged cliques[.]" (*Id.* at p. 80.)

We agree with the Attorney General that there was " 'no need' to connect FMT to the broader Norteño gang" here because there was sufficient evidence that Tovar conspired to murder Afoa for the benefit of FMT in particular.[10] (Quoting *Prunty, supra*, 62 Cal.4th at p. 80.) After emphasizing the importance of respect in Norteño gang culture, Officer Gannam testified that if an older and more well-respected member of a particular East Bay Norteño subset lost a fight, other local subsets would learn about it and the first subset's "reputation level as a whole [would] . . . fall." If the older member then killed the person who assaulted him, it would rehabilitate his subset's reputation by demonstrating that the subset "is serious and not to be messed around with." This testimony, along with other evidence in the case supporting the hypothetical's facts, constituted substantial evidence that Tovar conspired to commit murder to benefit his subset, FMT, not just Norteños generally.

Tovar argues that "Officer Gannam's testimony that when a gang member commits a retaliatory murder, it benefits his gang[,] . . . indiscriminately mixed supposed Norteño subsets into an impermissible whole" and did not refer to FMT in particular. In the testimony cited above, however, Officer Gannam explicitly distinguished between East Bay Norteño subsets by explaining that a murder committed in retaliation by a member of one subset would enhance that subset's reputation with other subsets. Given that Officer Gannam also testified that FMT is a local Norteño subset, we find it of little import that he did not specifically refer to FMT in answering the prosecutor's hypothetical.

---

[10] Therefore, we need not resolve the parties' dispute as to whether there was substantial evidence that Tovar acted in association with FMT.

We also agree with the Attorney General that Tovar's self-admitted membership in FMT permitted the inference that Tovar intended to benefit FMT in particular. *Prunty* observed that the "ample evidence" in that case that the defendant claimed to be a member of a specific subset "was likely sufficient for the jury to infer that [the defendant] intended to benefit that group[.]" (*Prunty, supra*, 62 Cal.4th at p. 82, fn. 6.) Tovar dismisses this statement as dicta, as *Prunty* held that even if there was proof the defendant committed the crime to benefit his subset, the gang enhancement still lacked substantial evidence because the predicate offenses introduced were committed by members of other subsets and there was insufficient evidence to link those subsets to the defendant's subset. (See *id.* at p. 82 & fn. 6.) But "Supreme Court dicta generally should be followed, particularly where the comments reflect the court's considered reasoning." (*People v. Rios* (2013) 222 Cal.App.4th 542, 563.)

Moreover, Tovar is incorrect that *Prunty*'s observation "conflate[s] membership with the separate element that the defendant intend[ed] to benefit the gang[,] . . . jeopardiz[ing] the due process requirement that [a] gang enhancement does not criminalize mere gang membership." The point *Prunty* made is not that a defendant's gang membership alone establishes the defendant committed a crime to benefit the defendant's gang. The point is that assuming there is otherwise evidence that the defendant committed a crime to benefit a gang, the defendant's membership in a particular subset is substantial evidence that the defendant committed the crime to benefit *that subset*, as opposed to a larger gang. (See *Prunty, supra*, 62 Cal.4th at p. 82 & fn. 6.) We conclude that Tovar's admitted membership in FMT constitutes further substantial evidence that Tovar conspired to commit murder for the benefit of FMT. Therefore, he fails to demonstrate that the gang enhancement lacked substantial evidence under *Prunty*.

III.
DISPOSITION

The judgment is affirmed.

10

_____

Humes, P.J.


We concur:


_____

Dondero, J.



_____

Banke, J.


*People v. Tovar*  (A145498)


11

Trial Court:

Superior Court of the County of Alameda

Trial Judge:

Hon. Morris Jacobson

Counsel for Defendant and Appellant:

Candace Hale

Counsel for Plaintiff and Respondent:

Kamala D. Harris, Attorney General

Gerald A. Engler, Chief Assistant Attorney General

Jeffrey M. Lawrence, Senior Assistant Attorney General

Eric D. Share, Supervising Deputy Attorney General

Elizabeth W. Hereford, Deputy Attorney General