Filed 8/29/22 P. v. Cummings CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANDRE LAMONT CUMMINGS,<br><br>Defendant and Appellant. | F081244<br><br>(Super. Ct. No. BF170662A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. John S. Somers, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri, Daniel B. Bernstein, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Following the consolidation of two domestic violence cases involving different victims,[1] defendant Andre Lamont Cummings was charged by information with nine felonies: two counts of willful infliction of corporal injury (Pen. Code, § 273.5, subd. (a); counts 1 & 9),[2] two counts of assault with force likely to produce great bodily injury (GBI) (§ 245, subd. (a)(4); counts 2 & 8); one count of battery with serious bodily injury (§ 243, subd. (d); count 3), kidnapping for ransom, reward, or extortion (§ 209, subd. (a); count 4), kidnapping for robbery (§ 209, subd. (b)(1); count 5), kidnapping by force or fear (§ 207, subd. (a); count 6); and false imprisonment (§§ 236/237, subd. (a); count 7).[3] As to count 1, the information alleged a prior qualifying conviction for the purpose of applying an elevated sentencing triad (§ 273.5, subd. (f)(1)); as to all counts except for count 3, it alleged a sentence enhancement for personal infliction of GBI (§ 12022.7, subd. (e)); and as to counts 4 through 9, it alleged an on-bail penalty enhancement (§ 12022.1).

The matter proceeded to trial and the jury acquitted defendant on count 5 but convicted him on the remaining eight counts and found the GBI enhancements true. In a bifurcated proceeding, the trial court found the prior conviction and on-bail enhancement allegations true.

On count 4, the trial court imposed a mandatory term of life without the possibility of parole, the upper term of five years for the GBI enhancement and two years for the on-bail penalty enhancement. On count 1, the court imposed the upper term of five years and the upper term of five years for the GBI enhancement, with the sentences on counts 1

---

[1]     Kern Superior Court case No. MF013310A was consolidated with Kern Superior Court case No. BF170662A.

[2]     All further references are to the Penal Code unless otherwise stated.

[3]     Counts 1 through 3 involved B.H., and counts 4 through 9 involved K.B., identified as Jane Doe in the information.

and 4 to run consecutively. On the remaining counts and attached GBI enhancements, the court imposed upper terms and stayed the sentences under section 654.

On appeal, defendant claims that admission of the conviction records for two of his co-arrestees, neither of whom testified, was prejudicial error under Evidence Code section 352 and the Sixth Amendment, entitling him to reversal of counts 4 and 6 through 9. He also claims his conviction on count 7 for false imprisonment must be reversed because it is a lesser included offense of count 4, kidnapping for ransom or extortion. Finally, via supplemental briefing, he seeks remand for resentencing under Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567).

The People concede that defendant's conviction for false imprisonment must be reversed as a lesser included offense of kidnapping and that remand for resentencing is required under Senate Bill 567. However, they contend admission of defendant's co-arrestees' conviction records was not erroneous under state or federal law and was not prejudicial in any event.

We conclude that, assuming error, admission of the conviction records for defendant's two co-arrestees "was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) We accept the People's concessions on the other two claims, reverse defendant's conviction on count 7 for false imprisonment, and remand for resentencing under Senate Bill 567. Except as modified, the judgment is affirmed.

## FACTUAL SUMMARY

### I. Prosecution Case

#### A. Counts 1 Through 3: 2017 Crimes Against B.H.

On July 27, 2017, due to a mechanical issue with his diesel truck, driver Kyle S. pulled over and parked on the shoulder of the onramp from Weedpatch Highway to Highway 58 in Kern County. At around 4:00 a.m., while a mechanic was working on his truck, Kyle heard a woman screaming for help from above him on Highway 58. From his

3.

position below, Kyle saw the woman, identified as B.H., running down the freeway shoulder toward a gas station with a large man, identified as defendant, chasing her. After B.H. fell on the incline, defendant caught up and started beating her. Kyle testified he saw defendant standing over B.H. hitting her with closed fists and he heard the blows. B.H. stopped screaming and fighting back at some point, and defendant began dragging her back up to their car by her hair. As she was being dragged, she seemed dazed and confused to Kyle, like a "'rag doll,'" which he explained meant she was unable to defend herself.

Kyle called 911 and reported what he was seeing. That call, which was consistent with his trial testimony, was played for the jury. Kyle testified he called 911 a second time because he thought B.H. was unconscious. As defendant was putting B.H. back in the car and while Kyle was still on the phone with 911 the second time, a California Highway Patrol (CHP) vehicle pulled up.

When CHP Officers Ehret and Vidal arrived, defendant was in the driver's seat and B.H. was in the front passenger seat. She was unconscious, disheveled, and had grass in her hair and blood on her face. Officer Ehret shook B.H.'s arm to rouse her and when she awoke, she appeared dazed. Her face was bloody, and defendant had blood smeared on his T-shirt. An ambulance was summoned, and Ehret located keys to defendant's car down the embankment where he was directed by Kyle.

Kern County Sheriff's Deputy Almanza subsequently responded to the scene and took over the investigation. He testified that B.H. had fresh injuries to her face and neck, blood coming from inside her ear, and debris in her hair. He arrested defendant.

B.H. testified that she and defendant were in a relationship from 2009 to 2016, approximately, but she saw him on occasion after 2016. She had been drinking that night and did not want to go with defendant to California City, so she got out of the car. She did not realize how steep the hill in that area was, and she fell and rolled down. Defendant followed her, helped her up, and asked if she was okay.

4.

B.H. said she did not know if defendant hit her, she did not remember if he strangled her, and she denied he punched her. She was told by an officer that she passed out and when she woke up, she was in the car and had grass in her hair. She recalled arguing with defendant but not telling the deputy defendant accused her of cheating, and she denied they were arguing for that reason. B.H. conceded that she had injuries in the prosecution's photographs and that she did not have injuries before she exited the car. However, she said she rolled down a hill and had no injuries the next day.

B.H. was questioned regarding two prior incidents of violence. B.H. said she did not recall calling the police or telling Officer Kelakios in January 2017 that defendant was angry at her for speaking to other men on Facebook and that he strangled her into unconsciousness. She said all she remembered was defendant calling the police and having her arrested. She denied she was taking the position that defendant was never violent with her, but she did not know if he was violent in January 2017 and she did not recall the prosecution's photograph showing injuries to her neck.

Regarding the second incident, B.H. recalled testifying in a trial against Michael McClendon. However, she did not remember whether she was asked about her two black eyes or if she said defendant caused them. She stated she had two altercations and did not know how she got the black eyes, and she denied testifying that defendant was responsible. She also denied testifying that she was unsure whether it was McClendon or defendant who harmed her. She was unsure if she was injured by McClendon or in a bar fight, and she did not recall testifying that defendant hit and punched her.

Defendant wrote to B.H. from jail and asked her to talk to his lawyer, but she testified she did not know why and she denied he asked her to drop the charges. In the letter, defendant wrote, "'I'm getting my head clear in here. Your love bug is back.'" On cross-examination, B.H. said that at the time, defendant was not acting like himself because his mother had passed away. She also testified he was referring to his drug use and when he mentioned hitting her, he did not mean physical hitting.

5.

Officer Kelakios testified that he responded to a domestic disturbance call in January 2017. B.H. told Kelakios that defendant came home drunk, accused her of talking to other men on Facebook, and "choked" her with both of his hands until she lost consciousness for several seconds. He took photographs of her showing red marks and scratches on both sides of her neck, and she told him that defendant caused the injuries. Kelakios arrested defendant.

Jeri Darr, a clinical social worker, testified as an expert in domestic violence.[4] Darr described the cycle as one where tension builds until violence occurs, after which there is a honeymoon period before the tension begins building again. Darr explained that domestic violence is related to learned behaviors and low self-esteem; and that it is common for victims to stay with their abusers, to blame themselves for the violence, and to have been in multiple relationships involving domestic violence. It is also common for victims to cooperate during the first 48 to 72 hours, after which they cease cooperating and change their stories. Darr testified that in all cases, victims minimize what happened and 95 percent of the time, they offer alternate explanations for their injuries, such as running into doorknobs or cabinet doors. While strangulation is not unusual in domestic violence, Darr described it as severe and stated it reflects an escalation of violence in the relationship.

Bridgett Amos, a registered nurse working in a hospital assault unit, testified regarding strangulation. She explained that although victims often refer to strangulation as choking, strangulation refers to external pressure applied to the throat while choking is caused by an internal blockage of the windpipe. The most common form of strangulation is manual, meaning by hand. Signs of strangulation include neck bruising, a raspy voice, coughing, loss of consciousness, broken blood vessels from the point of strangulation

---

[4]    The jury was instructed that Darr's testimony on domestic partner battery was limited to evaluating the conduct and credibility of B.H.

upward, posttraumatic stress disorder, and depression, anxiety, or memory loss due to brain cell damage from lack of oxygen. However, strangulation does not always result in bruising or other external signs, and, due to internal swelling, strangulation may cause death even when there are no external signs. Shown photographs of the injuries to B.H. and to K.B., Amos testified that their injuries were consistent with strangulation.

### B. Counts 4 Through 9: 2019 Crimes Against K.B.

On January 31, 2019, K.B. arranged for defendant, who had been her boyfriend 15 years earlier, to purchase $500 of methamphetamine from S.R. For the referral, K.B. was given some methamphetamine for personal use and although sober at trial, she said she was a functional addict at that time. Defendant was short by $50 as to the drug deal so he left his EBT card with S.R. Unbeknownst to K.B., defendant arranged a second drug deal with S.R. hours later to address the $50 shortage and to obtain additional drugs.

Defendant called K.B. in the early morning hours of February 1, 2019, and asked her to help him. She agreed and testified she thought she was going to help defendant get money to pay S.R. back for the first drug deal. She was not aware of the second drug deal or that defendant was upset because he believed he had been shorted by S.R. Defendant arrived in a car driven by a woman K.B. did not know. K.B. got in and they left but they did not proceed to an ATM, as K.B. expected, and that began what K.B. described at trial as her nightmare.

Defendant told K.B. he wanted his money or his drugs, and to call S.R. He also told her she needed to get his money back or she was going to pay. K.B. testified that she placed many calls to S.R., but spoke to her only once. During that conversation, S.R. said she would text K.B. the address where she was, but S.R. then turned her phone off and K.B. was unable to reach her again. Defendant told K.B. he was going to take her, and if "they" wanted her back, "they" had better bring his money or his "work," meaning drugs.

7.

K.B. was eventually taken to defendant's house in California City but twice during the drive, defendant directed the driver to stop the car and he told K.B. she could leave. Both times, she got out of the car and walked away, but defendant chased after her, hit her, and forced her to get back in the car. Defendant also yelled at her and hit her while they were driving around, and, at one point, he grabbed her by the neck and pushed her head into the seat, suffocating her. Defendant also hit K.B. in the face with a liquor bottle.

During the drive, defendant kept telling K.B. to call and get his money back. She testified she placed many phone calls, and an acquaintance finally called her back, but because the acquaintance was a man, defendant refused to let her speak with him. The acquaintance later found a woman to call K.B. back.

K.B. testified that defendant threatened to kill her and told her she could go either to her father's house and watch defendant torture and kill him or to defendant's house. To protect her father, K.B. chose defendant's house and defendant directed the driver to a location on Redwood Boulevard in California City. When they arrived, K.B. refused to get out of the car. After defendant knocked on the door and someone opened it, he returned to the car, pulled K.B. out, and took her inside to the kitchen. He said something to the effect of, "'Stephanie is going to be really happy about this one.'"

K.B. said Stephanie Darragh, who was defendant's ex-girlfriend and the mother of one of his children, was inside the house, along with Alisha Darragh, a man named Bruce, and Bruce's wife.[5] K.B. testified the driver of the car was also in the house for a short time. After locking the door, defendant told those inside not to let K.B. leave. Although no one else hurt her, defendant continued yelling and hitting her.

---

[5] The trial transcript and the parties' briefs refer to Alisha as Alicia. However, consistent with the prosecutor's spelling at the preliminary hearing, her record of conviction reflects her first name is Alisha. We refer to Stephanie and Alisha by first name since they share a last name.

K.B. received one or two phone calls from an acquaintance named Natasha, who knew and lived near K.B.'s mother, L.G., in Palmdale. K.B. was able to relate to Natasha that she was not alright and defendant was hurting her. Natasha then connected with L.G. in person, and L.G. was able to overhear what K.B. was telling Natasha on the phone. L.G. called the California City Police Department directly and her call was played for the jury.

In the call, L.G. identified herself and her daughter, and said K.B. was with defendant in California City, where he was "beatin[g] the crap out of [her]." L.G. said that K.B. managed to make a call while pretending to get ahold of someone, and L.G. relayed that defendant was beating K.B. presently, as L.G. was on the phone with the police department.

K.B.'s ordeal ended when police knocked on the door of defendant's house. Officer Boston testified that defendant answered the door and stepped outside. When asked, he said K.B. was inside. Boston knocked again, Alisha answered, and Boston entered the house, where he found K.B. with a bloody nose and blood on her hands. She looked like she had been crying. K.B. said defendant had struck her, and she went to the police station to give a statement.

K.B. told Boston defendant picked her up in Palmdale, and yelled at her, hit her, and strangled her in the car. K.B. said she did not owe defendant any money, but she agreed to give him $20 if he took her home. Instead, he took her to his house and tied her up. Stephanie and Alisha were there when defendant was striking her; and defendant told them to assault her and not to let her leave. Boston testified that K.B. had injuries consistent with being punched and strangled.

The jury saw photos of scratches, bruising, and finger marks on K.B.'s neck that she said were inflicted by defendant. K.B. also had two black eyes and testified that she was blinded in one of her eyes for months. Her vision was slowly returning, but was still

9.

blurry at the time of trial. She testified that defendant hit her more than 100 times and threatened her.

K.B. had an immunity agreement with the prosecution and had one misdemeanor conviction from August 2017 for assault with a deadly weapon. She admitted she did not tell the entire story to police or at the preliminary hearing. She left out her and S.R.'s involvement, but she did state she thought the incident was drug related. K.B. also did not give police the information about reaching an acquaintance on the phone or being hit with a liquor bottle; and when applying for a restraining order, she did not mention the liquor bottle or that defendant threatened to kill her. She also did not state that defendant threatened to kill her father when seeking the restraining order or at the preliminary hearing.

### C. Other Evidence

Stephanie and Alisha did not testify at trial, but the prosecutor introduced conviction records showing that on February 19, 2019, they both pleaded no contest to misdemeanor false imprisonment. Due to the unavailability of Ken Stafford, a defense investigator, the parties stipulated that on March 22, 2020, the driver, Kaylee Lake, told Stafford that K.B. appeared uninjured when she got into Lake's car, K.B. told defendant to stop because she wanted out, and defendant took K.B. into his house.

## II. Defense Case

Lake testified for the defense. She said she knew defendant from selling rims and tires to him, but she did not recognize him in the courtroom. On February 1, 2019, defendant approached her at a gas station in California City and asked her for a ride. He was polite and offered to pay for the gas. She presumed he wanted a ride home but after he got in the car, he directed her to drive to Rosamund, which was about 20 miles south of California City. Defendant was texting during the drive and after Lake passed the Rosamund exit, he told her to keep going. They ended up in Palmdale, which was about 30 minutes south of Rosamund.

10.

After stopping first at a residence where no one answered the door and then a convenience store, defendant directed Lake to another residence. K.B. came out and got in the back seat. Lake did not know K.B., but testified she was nice and thanked Lake for the ride. K.B. was on the phone trying to get directions somewhere, and K.B. and defendant had Lake stop at a gas station at one point.

It was getting late, and Lake wanted to go home because she had to work in the morning. After K.B. said her friend wanted to meet in the Little Rock area, which Lake described as west of Palmdale "in the middle of nowhere," Lake objected.

Lake testified that K.B. got out of the car once while they were still in Palmdale, and K.B. was quiet when she got back in. Lake drove north and gassed up in Lancaster. She said defendant went inside to pay while K.B. stayed in the car with her.

Between Rosamund and Mojave, K.B. asked Lake to stop the car on the side of the highway and K.B. got out a second time. Defendant got out, too, and both returned to the car after a few minutes. Lake said she did not watch them and did not know what they were doing. K.B. was quiet when she got back in the car.

Lake dropped defendant and K.B. off at a house on Redwood Boulevard in California City. She did not leave, however, because defendant had her phone when he went inside the house. A girl came out and told Lake to come inside, but she replied she did not want to and wanted her phone back. Defendant returned with her phone and told her she needed to find his truck for him. Lake drove around until she spotted defendant's truck. By then, it was 4:30 a.m. Lake returned to the house to tell defendant where his truck was and saw police cars with lights at the house. She left and went home to bed.

Lake told the jury she wanted no part of whatever was going on. Although defendant and K.B. were on their phones and were passing phones back and forth, Lake did not pay attention to what they were talking about and said she tries to stay out of people's business. She denied seeing defendant hit K.B. and denied hearing him either threaten K.B. or tell her she could not leave.

11.

Police later contacted Lake and although she told them she did not know what happened on Redwood Boulevard, she was arrested and entered a no contest plea to false imprisonment two weeks later. At trial, Lake denied any involvement in falsely imprisoning K.B. She said she entered a plea to get out of jail and return home to her child. Lake conceded K.B. appeared uninjured when she got into the car, but she said K.B. was in the backseat and Lake did not look at her.

Officer Boston testified that K.B. told him defendant picked her up around 1:30 a.m., and Boston located K.B. at defendant's house around 4:30 a.m. K.B. told Boston that she and defendant arrived at the house shortly before police did. K.B. said there was a money issue, but she did not mention a drug deal. She told him that defendant hit her twice with his fist and strangled her, and that at the house, he hit her five or six times with his fist and another five times with his open hand. K.B.'s eyes were swollen and her nose was bleeding, consistent with being struck numerous times, although not 100 times. Boston did not recall K.B. mention she was hit with a liquor bottle.

While Lake denied it during her testimony, Boston said that when he told Lake he wanted to talk about what happened, "[s]he became somber, lowered her head, and said 'it was real bad.'" Lake did not deny to Boston knowledge of what he was asking about or state to him that she did not know what happened. Boston arrested Lake, as well as Stephanie and Alisha.

## DISCUSSION

### I. Admission of Stephanie's and Alisha's Records of Conviction

#### A. Background

Boston arrested Stephanie and Alisha in connection with the crimes committed against K.B. Weeks later, they pleaded no contest to misdemeanor false imprisonment.

Although Stephanie and Alisha were on the prosecution's witness list, during trial the prosecutor filed a motion seeking the admission of the certified records of their

12.

convictions, pursuant to Evidence Code section 452.5, subdivision (b), and *People v. Duran* (2002) 97 Cal.App.4th 1448 (*Duran*). The prosecutor stated it was her intention to rely on the records whether or not she called Stephanie and Alisha to testify, in conjunction with the evidence that they were found at the house with K.B. and were arrested. Defense counsel objected to the evidence as unduly prejudicial under Evidence Code section 352. The trial court indicated it was inclined to grant the prosecutor's motion, but reserved its ruling pending further review.

The trial court subsequently raised several concerns it had with admission of the conviction records, including under the Sixth Amendment, and it again deferred its ruling to allow the parties an opportunity to research and address those issues. The prosecutor then argued that the conviction records, which were limited to superior court docket records, did not constitute testimonial hearsay under the Sixth Amendment. Defense counsel took the contrary position that the evidence was testimonial and there was no showing that Stephanie and Alisha were unavailable as witnesses. In response, the prosecutor stated she was offering the convictions to corroborate K.B.'s testimony.

The trial court concluded that the conviction records were admissible under the hearsay exception set forth in Evidence Code section 452.5 to show the fact of conviction for misdemeanor false imprisonment, but they were not admissible to show commission of criminal offenses by defendant. The court further concluded that the Sixth Amendment issue appeared resolved by *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 (*Taulton*), cited by the prosecutor for the proposition that conviction records are not testimonial. On these grounds, the court found the evidence admissible to show Stephanie's and Alisha's involvement and, potentially, to corroborate K.B.'s testimony. Subsequently, the court noted the issue was unusual but reiterated that under *Duran*, the evidence, which was limited to the fact of the convictions, was admissible.

At the close of the prosecution's case-in-chief, the trial court admitted the conviction records and gave the jury a limiting instruction.[6] As anticipated, the records admitted were confined to certified copies of the superior court's docket showing case events.

On appeal, defendant pursues the claim made in the trial court: admission of Stephanie's and Alisha's conviction records was an abuse of discretion under Evidence Code section 352 and violated the confrontation clause of the Sixth Amendment because the records are testimonial and there was no showing Stephanie and Alisha were unavailable witnesses. The People assert admission was not error under state or federal law, but assuming error, it was harmless.

**B.** **Summarization of Legal Principles**

**1.** **Evidence Code Section 352**

Evidence Code section 452.5, subdivision (b)(1), provides that "[a]n official record of conviction certified in accordance with subdivision (a) of [Evidence Code] Section 1530, or an electronically digitized copy thereof, is admissible under [Evidence Code] Section 1280 to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record." Evidence Code Section 1280 in turn provides that "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if … [¶] (a) [t]he writing was made by and within the

---

**6** The trial court's limiting instruction was as follows: "Ladies and gentlemen, I'm going to instruct you that the two documents just admitted, People's 40 and 41 are records of a conviction for both respectively Stephanie Darragh and Ali[sh]a Darragh of the crime of false imprisonment as a misdemeanor. You are instructed that these documents and the evidence of those convictions is to be considered only insofar as it has a tendency to prove the involvement of Stephanie and Ali[sh]a Darragh in any crimes in this particular case. They are not to be considered as evidence against [defendant] in any way and they are not to be considered as or used or considered against him but only for the purpose I previously described."

scope of duty of a public employee[, ¶] (b) [t]he writing was made at or near the time of the act, condition, or event[, and ¶] (c) [t]he sources of information and method and time of preparation were such as to indicate its trustworthiness."

In *Duran*, the Court of Appeal held that "Evidence Code section 452.5, subdivision (b) creates a hearsay exception allowing admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred." (*Duran, supra*, 97 Cal.App.4th at p. 1460.) However, otherwise admissible evidence is nevertheless constrained by Evidence Code section 352, which provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Here, the trial court noted that the admission of a nontestifying witness's conviction record to bolster a testifying witness's credibility was unusual. Although not discussed in the trial court, on review, defendant cites two California Supreme Court cases in support of his argument that it was error under Evidence Code section 352 to admit the evidence. In *Leonard*, the California Supreme Court did not reach the defendant's claim that admission of his co-arrestee's guilty plea as a declaration against interest under Evidence Code section 1230 violated his right of confrontation and cross-examination under the Sixth Amendment because it found admission was an abuse of discretion under Evidence Code section 352. (*People v. Leonard* (1983) 34 Cal.3d 183, 187 (*Leonard*).) The court reasoned that the probative value of the evidence was "questionable at best" and "[t]he prejudicial effect … [was] clearly substantial and far outweigh[ed] any probative value the evidence might have." (*Id.* at p. 188.) The court concluded that the error in admitting the evidence could not be deemed harmless. (*Id.* at p. 189.)

15.

Subsequently, in *Cummings*, codefendants Raynard Cummings and Kenneth Gay were charged with multiple crimes, including the murder of a police officer, and were tried before separate juries. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1255 (*Cummings*), disapproved on another ground in *People v. Merritt* (2017) 2 Cal.5th 819, 831 (*Merritt*).) Their wives, Pamela Cummings and Robin Gay, were also involved in the crimes. (*Cummings, supra*, at p. 1258.) At the time of their trial, Raynard Cummings had pleaded guilty to two counts of attempted robbery and one count of conspiracy to commit robbery (*id.* at pp. 1255–1256), Robin was serving a sentence following conviction for robbery and being an accessory after the murder (*id.* at p. 1271), and Pamela was awaiting sentencing after pleading guilty to robbery and being accessory to murder (*id.* at p. 1264, fn. 8). Both women testified (*id.* at pp. 1268–1269, 1271), and, on appeal, in relevant part, Gay challenged the admission of Robin's conviction and Raynard Cummings's guilty plea (*id.* at pp. 1294 & 1321).

As to the murder charge, the California Supreme Court rejected the People's argument that evidence of Robin's conviction, of which the trial court took judicial notice,[7] was relevant to corroboration of Pamela's testimony. (*Cummings, supra*, 4 Cal.4th at pp. 1294–1295 & fn. 36.) The court stated, "The conviction reflected only the view of a judge or jury that evidence presented in a different case established that Robin had assisted the defendants or either of them after the murder." (*Id.* at p. 1294.) Further, "the trial court did not rule on the objection that the evidence was more prejudicial than probative. It clearly was. Although Robin's assistance to either her husband or Cummings could have been the basis for the conviction, it is inconceivable that the jury would not understand the evidence to reflect guilt of aiding her husband who, by

---

[7] *Cummings* was decided prior to the enactment of Evidence Code section 452.5. (See *Duran, supra*, 97 Cal.App.4th at p. 1460 ["In 1996, the Legislature enacted Evidence Code section 452.5, which provides the type of hearsay exception contemplated in [*People v.*] *Wheeler* [(1992) 4 Cal.4th 284]."])

16.

necessary implication, had committed a murder." (*Id.* at p. 1295.) However, the court found the admission of Robin's conviction harmless as to Gay's murder conviction. (*Ibid.*)

Regarding Gay's challenge to the robbery-related charges, the court reversed Gay's convictions based on instructional error. (*Cummings, supra*, 4 Cal.4th at p. 1306, overruled on this ground by *Merritt, supra*, 2 Cal.5th at pp. 828–831.) In the event of retrial, the court offered guidance on the propriety of admitting evidence of Robin's conviction and Raynard Cummings's guilty plea (*Cummings, supra*, at p. 1321), explaining, "The trial court ruled that evidence of Cummings's guilty pleas was admissible because it corroborated Pamela's testimony regarding the robberies and the conspiracy. It did so only insofar as she had testified that Cummings participated in those offenses, however. It does not corroborate her testimony that Gay was a participant unless one infers that Gay was Cummings's crime partner in all of the robberies committed by Cummings. Any probative value attached to that inference is clearly outweighed by the prejudicial impact of the evidence. (Cf. *People v. Leonard* [*, supra*,] 34 Cal.3d [at p.] 188.) [¶] The People argue that the evidence was also admissible because Pamela's credibility was in issue. Again we disagree. Evidence of a codefendant's guilty pleas which is more prejudicial than probative when offered to raise an inference of the defendant's guilt is per se more prejudicial than probative when offered simply to bolster the credibility of another witness." (*Id.* at p. 1322.)[8] In light of *Leonard* and *Cummings*, defendant contends that Stephanie's and Alisha's convictions should have been excluded as more prejudicial than probative under Evidence Code section 352.

### 2. Sixth Amendment

---

[8] Although dicta, the court's comments are nevertheless instructive. (*People v. Tovar* (2017) 10 Cal.App.5th 750, 759; *People v. Rios* (2013) 222 Cal.App.4th 542, 563.)

17.

Additional restrictions arise under "'[t]he Sixth Amendment's Confrontation Clause[, which] provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him."'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42.) '*Crawford* held that the clause bars introduction of "testimonial" hearsay against a defendant unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 398, quoting *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 911–912.) What constitutes "'testimonial hearsay' remains an evolving area of the law." (*People v. Gonzalez, supra*, at p. 398, citing *People v. Amezcua and Flores, supra*, at p. 912; accord, *People v. Byron* (2009) 170 Cal.App.4th 657, 668.)

In this case, the trial court relied on *Taulton* in concluding that Stephanie's and Alisha's records of conviction were not testimonial. In *Taulton*, the defendant challenged the trial court's reliance on the procedure under section 969b to determine the truth of his prior convictions, claiming that under *Crawford*, the procedure infringed on his Sixth Amendment right to confront witnesses. (*Taulton, supra*, 129 Cal.App.4th at p. 1222.) The appellate court rejected the view that conviction records are testimonial in nature. (*Id.* at p. 1225; accord, *People v. Thompkins* (2020) 50 Cal.App.5th 365, 412.) The court explained, "Some public records, particularly police records of interrogations, would clearly fit the definition of 'testimonial statements,' as they are produced to be used in a potential criminal trial or to determine whether criminal charges should issue. But to the extent that public records are not prepared for this purpose, they are subject to the same analysis as business records and would not constitute 'testimonial statements.'" (*Taulton, supra*; at p. 1225; accord, *People v. Thompkins, supra*, at p. 412.)

After trial began in this case, but shortly before the prosecutor first requested admission of the records, another Court of Appeal disagreed that the issue of testimonial hearsay is clear cut as to conviction records. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 171 (*Garcia*).) Relying on *Kirby v. United States* (1899) 174 U.S. 47 (*Kirby*), the

18.

court stated, "We are not persuaded that all records of prior criminal convictions are immune from confrontation clause challenge. Instead, whether admission of such records violates the confrontation clause as interpreted in *Kirby* depends on the fact the prosecution seeks to prove with the document. To the extent that the prosecution offers a record of conviction solely to show the fact of the prior conviction, admission of that document is consistent with *Kirby* and does not violate the confrontation clause. But *Kirby* also holds that the use of a record of a prior conviction to prove any fact other than the fact of conviction violates the Sixth Amendment. In the words of modern jurisprudence, records of convictions used to prove facts other than the fact of conviction itself *are* testimonial. In *Kirby*, for example, the record of prior conviction would have been properly admitted to prove the fact of the prior conviction but not to prove that the stamps *Kirby* possessed were the property of the United States. (*Kirby, supra*, 174 U.S. at p. 54.)" (*Garcia, supra*, at pp. 171–172.)

At issue in *Garcia* was the admission of a complaint to prove the commission date of a qualifying predicate offense necessary to prove gang enhancement allegations under section 186.22, subdivision (b). (*Garcia, supra*, 46 Cal.App.5th at p. 172.) The court concluded that under *Kirby*, "admission of Flenaugh's complaint from his prior conviction to prove the date on which Flenaugh committed the crime violated [the defendant's] rights under the confrontation clause." (*Garcia, supra*, at p. 172.) "If the prosecution offered a record of a prior conviction solely to prove that individual had suffered a 'conviction' of that offense, then such a record would not be testimonial under *Kirby*." (*Ibid.*) However, "[u]se of this complaint from Flenaugh's prior conviction to prove the date on which Flenaugh committed the offense plainly violates *Kirby*'s proscription of the use of the records of prior convictions to prove any fact other than the fact of the prior conviction. The date of the commission of a crime is a fact that 'can be primarily established only by witnesses.' (*Kirby, supra*, 174 U.S. at p. 55.)" (*Ibid.*)

We acknowledge these diverging views on the Sixth Amendment issue, but conclude we need not decide whether we are persuaded by *Garcia*, because, as discussed next, admission of the conviction records was unquestionably harmless in this case.

## C. Any Error Harmless

The trial court gave a limiting instruction to the jury regarding Stephanie's and Alisha's convictions, and although the prosecutor mentioned the convictions in closing argument, she did not emphasize them. Given the strength of the evidence in this case, even if we assume that admission of Stephanie's and Alisha's conviction records was an abuse of discretion under Evidence Code section 352 and violated the Sixth Amendment, it was not prejudicial.

State law errors are reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837, which requires a determination "whether there is a 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error." (*People v. Aranda* (2012) 55 Cal.4th 342, 354.) However, under the more stringent federal standard articulated in *Chapman, supra*, 386 U.S. at page 24, courts "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Merritt, supra*, 2 Cal.5th at p. 831; accord, *Neder v. United States* (1999) 527 U.S. 1, 15–16, 18; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663). "The ultimate inquiry is ""whether the … verdict actually rendered in this trial was surely unattributable to the error.""" (*People v. Penunuri* (2018) 5 Cal.5th 126, 158, quoting *People v. Pearson* (2013) 56 Cal.4th 393, 463.)

Identity was not at issue here and the evidence against defendant was exceptionally strong. Although K.B. was a drug user, has a misdemeanor conviction, was given immunity, and testified defendant hit her more than 100 times, perhaps improbably, as defendant points out, K.B. was a cooperative witness and she testified in detail. After she managed to connect with Natasha on the phone during the crimes, her mother made a

recorded call to the California City Police Department, which was played for the jury and during which her mother relayed, in real time, that K.B. was being beaten by defendant.

Based on that call, police were dispatched to defendant's house on Redwood Boulevard, where defendant, Stephanie, Alisha, and K.B. were present. K.B. had fresh, visible injuries, and the jury saw photographs of those injuries, which included black eyes and marks on her neck that an expert testified were consisted with strangulation. While Stephanie and Alisha did not testify, Lake testified and she, too, pleaded to false imprisonment. Although Lake denied hearing or seeing anything unusual during the car ride, her version of events was clearly undermined by both her plea to false imprisonment and Officer Boston's testimony that she hung her head and said what occurred "'was real bad.'"

Under the circumstances, the admission of Stephanie's and Alisha's conviction records was harmless beyond a reasonable doubt, and we reject defendant's claim of reversible error as to counts 4 and 6 through 9. Therefore, we need not and do not determine whether admission of the evidence was error under state or federal law.

## II.    Conviction for Greater and Lesser Included Offenses in Counts 4 and 7

It is well settled that "[a] defendant may be convicted of more than one offense based on the same act or a single course of conduct. [Citations.] However, a defendant may not be convicted of two such offenses if one is a necessarily included lesser offense of the other." (*People v. Robinson* (2014) 232 Cal.App.4th 69, 73, citing § 954 & *People v. Reed* (2006) 38 Cal.4th 1224, 1227; accord, *People v. Delgado* (2017) 2 Cal.5th 544, 570.) "[I]f the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that the greater offense cannot be committed without also committing the lesser offense, the latter is necessarily included in the former." (*People v. Robinson, supra*, at p. 74, citing *People v. Reed, supra*, at p. 1230 & *People v. Smith* (2013) 57 Cal.4th 232, 240.)

21.

The parties agree that defendant's conviction on count 7 for falsely imprisoning K.B. should be reversed in light of his conviction on count 4 for kidnapping her for robbery, reward, or extortion because false imprisonment is a lesser included offense of kidnapping and the events occurred during a continuing course of conduct. (E.g., *People v. Eid* (2014) 59 Cal.4th 650, 656; *People v. Jandres* (2014) 226 Cal.App.4th 340, 362; *People v. Chacon* (1995) 37 Cal.App.4th 52, 65; *People v. Magana* (1991) 230 Cal.App.3d 1117, 1120–1121.) We accept the People's concession of error and reverse defendant's conviction on count 7.

## III. Senate Bill 567

Finally, in supplemental briefing, the parties agree that defendant is entitled to remand for resentencing pursuant to Senate Bill 567, which became effective January 1, 2022. As amended by Senate Bill 567, section 1170 now provides, "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (*Id.*, subd. (b)(1).) "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.…" (*Id.*, subd. (b)(2).)

Also amended by Senate Bill 567, section 1170.1, applicable to enhancements, provides, "When the court imposes a sentence for a felony pursuant to Section 1170 or subdivision (b) of Section 1168, the court shall also impose, in addition and consecutive to the offense of which the person has been convicted, the additional terms provided for any applicable enhancements. If an enhancement is punishable by one of three terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (*Id.*, subd. (d)(1).) "The

22.

court may impose a sentence exceeding the middle term only when there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subd. (d)(2).)

Although defendant was sentenced in 2020, "[n]ewly enacted legislation lessening criminal punishment or reducing criminal liability presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date." (*People v. Gentile* (2020) 10 Cal.5th 830, 852, citing *In re Estrada* (1965) 63 Cal.2d 740, 744–745; accord, *People v. Esquivel* (2021) 11 Cal.5th 671, 673 & 675–676.) "This presumption 'rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*People v. Gentile, supra*, at p. 852; accord, *People v. Esquivel, supra*, at p. 675.) Senate Bill 567 is ameliorative and, therefore, it applies in this nonfinal case. (*People v. Dunn* (2022) 81 Cal.App.5th 394, 402–403; *People v. Banner* (2022) 77 Cal.App.5th 226, 240.)

With the exception of the mandatory life term on count 4 and section 12022.1, which provides for a two-year on-bail enhancement term, the trial court selected the upper terms for the counts and GBI enhancements. Although the trial court may base its findings on certified records in some circumstances (§ 1170, subd. (b)(3)), the middle term is now the presumptive term, and the People concede remand is required because the record does not, either expressly or impliedly, set forth the reasons the court selected the upper terms.

"'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,'" and where the defendant has been sentenced in the absence of informed discretion, "the appropriate remedy is to remand for

23.

resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; accord, *People v. Flores* (2020) 9 Cal.5th 371, 431–432.) In light of the amendments to sections 1170 and 1170.1 under Senate Bill 567; the record in this case; and the absence of any clear indication that remand would be futile, we accept the People's concession that remand is the appropriate remedy. On remand, the trial court shall reconsider its sentencing choices and impose the terms it determines are appropriate under sections 1170 and 1170.1 as amended by Senate Bill 567.

## DISPOSITION

Defendant's conviction on count 7 for false imprisonment is reversed, and pursuant to Senate Bill 567, this matter is remanded for resentencing. Following resentencing, the trial court shall forward an amended abstract of judgment to the appropriate authorities. Except as modified, the judgment is affirmed.

MEEHAN, Acting P. J.

WE CONCUR:

SNAUFFER, J.

DeSANTOS, J.

24.