Filed 3/30/23  P. v. Bartholomew CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>THEODORE BLAIR BARTHOLOMEW,<br><br>        Defendant and Appellant. | A164830<br><br>(City & County of San Francisco Super. Ct. No. SCN122527) |

In 1987, defendant Theodore Blair Bartholomew pled guilty to the second degree murder of Larry Gaines, and received a sentence of 15 years to life in prison.  This appeal is from the trial court's denial of Bartholomew's petition to vacate his conviction pursuant to Penal Code section 1172.6 (former section 1170.95).[1]  The prosecution conceded that Bartholomew was not the actual killer, but after an evidentiary hearing, the trial court found that he could be convicted of second degree murder as an aider and abettor who acted with implied malice.  Bartholomew advances

---

[1] All undesignated section references are to the Penal Code. Section 1170.95 was renumbered section 1172.6, without substantive change, effective June 30, 2022.  (Stats. 2022, ch. 58, § 10.)  For clarity, we will refer to the section by its current numbering.

1

three arguments on appeal: (1) aiding and abetting implied malice murder is not a viable legal theory; (2) the prosecution presented insufficient evidence of his guilt; and (3) the trial court violated his Sixth and Eighth Amendment rights by failing to properly consider his youth when deciding whether he acted with implied malice.

While we disagree with most of Bartholomew's arguments, the trial court's own analysis indicated that this is a difficult case. At the time of the crime in 1984, Bartholomew was a 16-year-old runaway under the control of the actual killer, William White—a man twice his age who raped and prostituted him. Significantly, the trial court credited, at least to some extent, evidence that before White "unexpectedly" cut Gaines's neck, Bartholomew thought White was engaged in a "head game"—a brutal and sadistic sequence of acts intended to terrorize Gaines but not to kill him. Ultimately, however, the trial court concluded that Bartholomew "acted with the knowledge of Mr. White's unlawful intent, and that he did intend to assist William White toward Mr. White's unlawful ends."

The trial court identified evidence supporting its conclusion, but the record leaves us with some uncertainty about how it reconciled that evidence with the acknowledged possibility that Bartholomew thought he was a participant in a vicious head game. Because Bartholomew would lack the required mental state for aiding and abetting implied malice murder in that circumstance, to eliminate any doubt about the possibility of error we conclude that the best course is to remand the case to

2

the trial court to clarify its findings on this point and evaluate its ruling under the standards discussed below.

## BACKGROUND

### A.    *The Conviction and Petition*

In 1987, Bartholomew pled guilty to the second degree murder of Larry Gaines. (§ 187.) Bartholomew was 16 years old when the crime was committed, and Gaines was 17. The trial court sentenced Bartholomew to a term of 15 years to life in state prison, with the possibility of parole.[2]

In 2019, Bartholomew filed a petition seeking resentencing under section 1172.6 (former section 1170.95). The trial court summarily denied the petition on the ground that the record "support[ed] that Mr. Bartholomew had murder liability based on a direct aiding and abetting theory." This court reversed and remanded, finding that the trial court engaged in improper fact finding at the preliminary stage. (*People v. Bartholomew* (Aug. 27, 2021, A160078) [nonpub. opn.].)

On remand, the court received briefing and held an evidentiary hearing, receiving into evidence, among other things, Bartholomew's 1984 statement to police and Inspector Frank Falzon's testimony, described below.

---

[2] This court affirmed Bartholomew's conviction on direct appeal, with the opinion addressing only his argument that there was no probable cause for his arrest and that a statement he made to police investigators should have been suppressed as "fruit of the poisonous tree." (*People v. Bartholomew* (February 20, 1992, A053255) [nonpub. opn.].)

*B.    Bartholomew's 1984 Statement to Police*

At the time of the murder, William White, David Murdock, and Bartholomew lived together in a tent in San Francisco. (According to information elsewhere in the record, White was "in his thirties" and Murdock was 17.)  Bartholomew told police he first met White shortly after being released from four months in the San Bruno jail.  Bartholomew told White he wanted to leave San Francisco because he didn't want his parole officer to find him.  White invited him to go camping, telling him that they would "live off the land" and that White would buy him whatever he needed.  White was living at a hotel.  Bartholomew stayed there one night with him, and the next morning they loaded the car with their possessions, and a third person named John drove them to the Santa Cruz County line.  John then drove away, and White and Bartholomew left their things near the side of the road while they walked down a hill with their backpacks and radios to find a place to camp.  While there, they heard what sounded like police radios, so they waited because Bartholomew said the police were looking for him.  When they went back up, all their belongings were gone, and while White first told Bartholomew it was all his fault for being too lazy, he then said they had too much stuff anyway and they still had what they really needed.

They pitched the tent, and Bartholomew went to sleep but woke up to find White raping him.  Bartholomew was in pain, told White "I don't do this," but White said, "bullshit, punk, you do now."  White again blamed him for their stuff being stolen.  Bartholomew said he would pay him back for everything, that

4

they could go back to San Francisco where he would get the money somehow, but White said Bartholomew wouldn't be able to get it. White grabbed a stick and hit him in the head, and started beating him up. Afterwards, White told him he was his bitch and to go back to sleep. When Bartholomew woke in the morning, White raped him again. They returned to San Francisco, where White told Bartholomew he had to pay him back $500. White directed Bartholomew to go to Polk Street, where Bartholomew started selling his body to get money for White, and "it went on like this."

Bartholomew next described how, one day, White saw Murdock and said, "I'd like to have that boy there." White came up with a plan, instructing Bartholomew to tell Murdock about a man (i.e., White) who stays out in a tent and keeps $1,000 under his pillow, and to suggest that Bartholomew and Murdock could rob him. Bartholomew did so, but Murdock said he did not do that, and Bartholomew took off. White then approached Murdock and, "trying to play it out," expressed surprise at what Bartholomew had said, saying he thought Bartholomew was his friend. White eventually learned that Murdock had a bus ticket to return to Seattle, and, worried that he would leave, invited him back to his tent to show him something. At the tent, White raped Murdock and took his bus ticket, and told him he was now his bitch and would have to do the same thing Bartholomew was doing. White told Murdock he would give him a bus ticket after a couple of weeks. Murdock started bringing in money to make White happy, until eventually there was no more mention of a

bus ticket and White had both Murdock and Bartholomew "out there making money for him."

Bartholomew said that both he and Murdock were afraid of White, who took all of the money they were bringing in. When Bartholomew asked White what was happening with the money, White would get mad and beat him. At various times, White hit him with sticks, slapped him, and punched him with his fists. When asked if he loved White, Bartholomew answered that at one time he did, and so did Murdock.

Bartholomew had previously seen the victim, Larry Gaines, "a couple of times on the street." On the night of the murder, Bartholomew was in the tent and heard noise outside. He got a flashlight and went out, where he saw Murdock and White with Gaines. They all went inside the tent, where White said Gaines wanted "to join the club," but he then told Bartholomew and Murdock that he wanted to talk to them outside. Once outside, he told them that "this is the punk that got me fired from my job, and had a couple of guys come and say they'd beat my ass," and that they were going to "take care of him tonight."

Back in the tent, White told Bartholomew to get White's .22-caliber rifle and bullets. White then told Gaines that the gun was going to be the one that killed him. Gaines initially laughed after White made this statement, then stopped when he saw that White was serious. White told Murdock to get his gun, which he did. White and Murdock both pointed their guns at Gaines. White told Bartholomew to grab a stick, and White, Murdock, and Bartholomew took turns beating Gaines with it. White

directed Bartholomew and Murdock to grab leg shackles and handcuffs, and "we put them on and put the—took the handcuffs put them around him and then handcuffed his hand back to it." White said that Gaines should not have "fucked" him over. Bartholomew and Murdock put bandanas around Gaines's mouth, and Bartholomew placed silver tape on Gaines's mouth because White told him to do so. After Murdock cut off half of Gaines's hair at White's direction, White told Bartholomew and Murdock to leave the tent, and he raped Gaines once they did.

Bartholomew and Murdock went back inside the tent, and White told Murdock to get the BB gun. The three of them took turns shooting Gaines in the chest, back, and legs with it. After that, White picked up a bottle of RID (lice killer) and drew liquid into a syringe, asking Gaines whether he was body or head lice. White told Bartholomew to push the syringe into Gaines's temple; Bartholomew and Murdock injected both of Gaines's temples. White injected the liquid into Gaines's arm. When Gaines began to weave in a circle, White said, "that wasn't nothing but water, punk," and Gaines stopped weaving.

Although Bartholomew and Murdock declined, White told Gaines that he had to perform oral sex on them if he wanted to live. White then said they would take a vote on whether Gaines lived or died. Bartholomew told police, "So, we voted no." Investigator Falzon asked, " 'No' what?" Bartholomew responded, "That he dies." Bartholomew said they voted by putting their thumbs down. He continued, "Yeah, and then I go 'no' and then [Murdock] goes, 'no,' so [White] goes, ah, we'll kill

7

him, huh?  And we go 'yeah'; and then he goes I have the final decision, he goes both of you have (inaudible) do you realize that; so you know I didn't think he was serious, you know, and we go yeah, you know, started with just, you know, playing a head trip." Falzon responded, "You thought he was playing a head trip at this time, still?"  Bartholomew continued, "Yeah, I—you know, I thought he's always doing that, you know, playing trips; so then he goes okay, but, you know after we had shot him and stuff you know and put that syringe in there, you know, and squeezed the stuff in, you know he said it was water I still thought he was kidding, you know and then he sliced his neck, you know—."

Bartholomew said that White had gone to the other side of the tent, picked up a knife and "all of a sudden" got up and sliced Gaines's neck.  White then took a hatchet and chopped at Gaines's neck.  Gaines, bleeding, was lying on his side and making weird noises.  Bartholomew listened as White started kicking him.  Bartholomew and Murdock then dismembered Gaines's body because White told them to finish the job, and they took Gaines's head off.  They buried the body parts in various places.

In response to the following sequence of questions—"Why did [White] say he killed [Gaines]?"  "Why did [White] tell you that he killed [Gaines]?"  "Why did he kill [Gaines]?  Why did the three of you kill [Gaines]?"—Bartholomew  stated, "Well, [White] said that [Gaines] tried to hurt him once, you know, and I finally figured out that he had our minds to you know he would tell us to do something we'd do it and that's why we killed [Gaines],

8

because he said he hates me, you know, and tried to hurt me, you know, so he said what do you want to do with him? We said well he can't be here if he wants to hurt you, you know, because he told us that, you know, to always protect him no matter what, you know."

Asked if he knew of any other crimes or murders that White had committed, Bartholomew said no. Bartholomew was then asked if he was ever with White when he hurt someone other than Gaines, and Bartholomew described an incident when a man came up to them and started tapping Murdock to try to get his attention. White told him to get back and to leave "my boys" alone, and then hit him in the chest. When the man walked across the street, White chased after him with a knife. Murdock and Bartholomew took off in the other direction, afraid that the man would come after them. When they saw White later, he told them that he had stabbed the man in the throat, but didn't know what had happened to him. Bartholomew said that this event happened about a month before Gaines's murder.

C.    *Inspector Falzon's Testimony*

Retired Police Inspector Frank Falzon testified that he had interviewed White, who was an adult, and he described White as a "psychotic serial pedophile murderer." White told Falzon he was living in a tent in San Francisco with three young boys and that he killed one of the boys, later identified as Gaines. According to Falzon, Gaines, Murdock, and Bartholomew were "[t]hree young boys at the mercy of a very vicious killer."

Falzon testified that he interviewed Bartholomew on October 26, 1984. Bartholomew was 16 years old at the time, and he gave a voluntary statement that led to his arrest. He told Falzon that White had a grudge against Gaines stemming from some incident, and White was not pleased by how Gaines was treating White, so he wanted to make an example of him in front of Bartholomew and Murdock.

Falzon vaguely recalled that Bartholomew told him he was a runaway and had been living in San Francisco for about three years. In Falzon's opinion, White, a man in his 30's, was one of the sickest individuals he had come across in his 22 years working in homicide and what he did to these young boys was diabolical. Falzon recalled that Bartholomew told him that he had been sexually abused and sodomized by White, and may also have said that White frequently beat him.

Falzon believed that Bartholomew became aware of White's "beef" with Gaines at the time the murder occurred: "my belief was it was all kind of spontaneous . . . I wasn't aware that Mr. Bartholomew knew ahead of time." Falzon also believed White was "pimping" Bartholomew and Murdock, ordering them to sell their bodies on the street and turn over all their earnings to White. Falzon also believed they completely depended on him to provide for them.

When Falzon interviewed White, White told Falzon he sodomized Gaines in the tent that night. Falzon described it as the more brutal of acts that started the vicious murder. Falzon believed Bartholomew and Murdock were terrified of White. He

10

also believed that White was the lead orchestrator of all the events and everything that was done was on White's orders. He agreed that it didn't matter what Bartholomew said or thought, that White "was going to do what he was going to do, which psychotic killers do." Asked about Bartholomew's statement that Bartholomew thought White was playing "head games" or "was actually kidding, with regard to this drastic killing," Falzon replied, "Of course these young boys would think he was kidding. They had never seen anything like this. That's what makes this case so horrible."

D.  *Ruling on the Petition*

The trial court denied the petition in an oral ruling. The court stated that the prosecution had rightfully conceded that Bartholomew was not the actual killer. It rejected liability under a felony-murder theory because neither kidnapping nor torture were qualifying felonies for first degree felony murder when Bartholomew was convicted, and second degree felony murder was not a viable theory under current law. The court rejected a theory of first degree murder by torture because such a theory would be cognizable only "if in fact the torture was the cause of death," and the People did not establish the torture was a basis of the victim's death. Addressing "actual malice," the court also found that Bartholomew had not acted with intent to kill.

The court nonetheless found that the prosecution had proven beyond a reasonable doubt that Bartholomew directly aided and abetted the murder with the requisite state of mind of implied malice. The court explained its ruling as follows:

11

"And the facts that the court finds that support Mr. Bartholomew acting as an aider and abettor with implied malice would be as follows: According to his statement—that's Mr. Bartholomew's—William [W]hite said, quote, or this is pretty close to exact words, 'We are going to take care of him tonight.' And, you know, Mr. White was discussing how the decedent had gotten [him] fired from his job, Mr. White had apparently used some type of rues [*sic*], along with Mr. Murdock, to get the decedent out to Lands End, and then Mr. White took Mr. Murdock and Mr. Bartholomew aside to say we're going to take care of him tonight.

"Against this backdrop, it's noted that Mr. Bartholomew was aware, and he stated he's aware, that Mr. White had been violent in the past. He[] in fact raped Mr. Bartholomew, he had raped Mr. Murdock, and later on, of course, he raped the decedent. [¶] But in addition to that, Mr. White had told Mr. Bartholomew that he had stabbed someone in the neck on Polk Street over a relatively minor dispute, it seemed, but Mr. Bartholomew was aware of that.

"As the night went on, Mr. Bartholomew indicated that Mr. White and Mr. Murdock, I believe both of them, were told to get a .22 rifle, like a real gun not a BB gun, a .22. There were two .22s, one belonged to Mr. Murdock, the other, I think, to Mr. White. And Mr. White told the decedent, "This will be the gun that kills you," and [] the decedent initially acted as if this was a joke or some kind of morbid kidding around. But according to Mr.

12

Bartholomew, the decedent soon realized that Mr. White was serious.

"Then at that point, shortly afterwards, both Mr. Bartholomew and Mr. Murdock hit the decedent with sticks at the direction of Mr. White, they cuffed and shackled the decedent at the request of Mr. White or at his direction. [¶] There's some ambiguity as to who exactly did the cuffing and shackling, but there seems to be some evidence [] that both Mr. Murdock and Mr. White—excuse me, Mr. Bartholomew participated in the cuffing and shackling of the decedent.

"It seems clear that Mr. Murdock and Mr. Bartholomew taped the decedent's mouth with duct tape and with bandannas. After that, Mr. Bartholomew recounted that he and Mr. Murdock went outside the tent and they heard behavior consistent with Mr. White raping the decedent.

"At some point Mr. Bartholomew returns to the tent with Mr. Murdock, Mr. White was present while they both shot the decedent with a BB gun, shoot him with BB's. All three of the men then, in turn, used the syringe, it either contained some type of poison or possibly water, it was unclear, but they used it to inject it into the head/temple area of the decedent. And it was at that point that Mr. Murdock indicates that the—Mr. White unexpectedly sliced the neck of the decedent.

"Prior to that, Mr. White had indicated and told the victim that he had to perform oral sex on Mr. Bartholomew or Mr. Murdock if he wanted to live, this was said prior to the cutting with the knife. Both of the men, Mr. Murdock and Mr.

13

Bartholomew, declined that. But it's notable that this statement about wanting to live was made prior to the slicing.

"Much has been made, and understandably by both parties, regarding the vote about whether or not the decedent should live. There's certainly arguments both ways that the—it was ambiguous as to whether it was thumbs up or thumbs down, but I think at some point it's not a much moment [*sic*]. Clearly, there was a discussion later on whether it was thumbs up or thumbs down. [¶] It seems clear to [*sic*] Mr. Bartholomew thought that the—while he thought that Mr. White might have been kidding or playing head trips, et cetera, that the—ultimately, the two men, Mr. Murdock and Mr. Bartholomew, said because the victim had done something to Mr. White that crossed him, that he had to go. And I think that looking at it in the context of everything that was said, Mr. Bartholomew was aware that he was voting yes, that the decedent should be killed, even if he was not completely sure that this wasn't just one of Mr. White's head games.

"As I noted, later on in his interview Mr. Bartholomew indicated that he and Murdock agreed to kill the victim, because the victim had crossed and was trying to hurt Mr. White by this incident that got him fired.

"According to Mr. Bartholomew, his best statement was that the events took one-to-two hours, may have included some of the things that happened after death. It's not completely clear when the decedent stopped breathing. There were more injuries than the initial knife cut, and it wasn't clear whether he

14

participated in some further cutting with the sharp instrument. There was no description of, perhaps, the decedent still being alive, also, while that was going on.

"Again, the court raised those facts against some other considerations, which were noted during the testimony by Inspector Falzon, that William White was, in the Inspector's considered opinion based on his long-term training and experience, [a] psychotic serial murderer who had to summarize undue influence on Mr. Bartholomew and Mr. Murdock. I'm not sure he used those words, but it's tantamount to essentially what he said.

"The court[']s also considering how impressionable Mr. Bartholomew was, his circumstances being sixteen-and-a-half years old, were guided by the contains [*sic*] In re Moore, M-o-o-r-e, at 68 Cal.App 5th 434, which in the context of felony murder, aiding—excuse me. Major participant, reckless indifference, analysis, recently indicated the Moore case than— that it's appropriate for the court to weigh the age of a participant, knowing what we know about young people. And, you know, their lack of development, their lack of cognition in some of their decision making. But weighing it all out and applying the standard, whether or not the People have satisfied the burden beyond a reasonable doubt, the court does find that Mr. Bartholomew did act with implied malice. That he acted with the knowledge of Mr. White's unlawful intent, and that he did intend to assist William White toward Mr. White's unlawful ends.

15

"The court finds that Mr. Bartholomew knew his conduct and danger of [*sic*] the decedent and that Mr. Bartholomew acted with conscious disregard for that life. [¶] So the motion filed by Mr. Bartholomew, pursuant to [section 1170.95] is denied, and that's the court's ruling."

DISCUSSION

1. *Legal Background*

Senate Bill No. 1437 (2017-2018 Reg. Sess.), effective January 1, 2019, "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); §§ 188, subd. (a)(3), 189, subd. (e); *People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) Prior to this amendment, the natural and probable consequences doctrine constituted an exception to the requirement of either express or implied malice for a murder conviction. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 953 (*Vargas*).) Now the natural and probable consequences doctrine can no longer support a murder conviction. (*Ibid.*; § 188, subd. (a)(3) ["Malice shall not be imputed to a person based solely on his or her participation in a crime"].)

Senate Bill No. 1437 also added what is now section 1172.6, which permits a person to petition for relief if he or she could no longer be convicted of murder under the amendments to sections 188 and 189. (§ 1172.6, subd. (a)(3); *Gentile, supra,*

16

10 Cal.5th at p. 843.)  Where the petitioner makes a prima facie showing of entitlement to relief, the trial court proceeds to an evidentiary hearing to determine whether to vacate the murder conviction.  (§ 1172.6, subd. (d)(1).)  The prosecution has the burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (d)(3).)  "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."  (*Ibid.*)

On appeal from denial of a section 1172.6 petition after an evidentiary hearing, we review the trial court's decision for substantial evidence.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  "Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt."  (*Ibid.*)  "We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' "  (*Ibid.*)

## 2. *Validity of Aiding and Abetting Implied Malice Murder*

We first address Bartholomew's threshold claim that, after the enactment of Senate Bill No. 1437, he cannot be convicted of second degree murder as a direct aider and abettor who acted with implied malice. Starting with *People v. Powell (*2021) 63 Cal.App.5th 689, 713 (*Powell*), many courts have rejected this same argument. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599–600 (*Glukhoy*); *People v. Schell* (2022) 84 Cal.App.5th 437, 442; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388–392.) Defendant contends *Powell* was wrongly decided and is inconsistent with *Gentile, supra*, 10 Cal.5th 830. As set forth below, we disagree.

*Powell* held that aiding and abetting a murder with implied malice is a valid theory of liability for second degree murder. (*Powell, supra*, 63 Cal.App.5th at pp. 710–714.) In so holding, the court explained the actus reus and mens rea elements of aiding and abetting a murder with implied malice. The actus reus required of the actual perpetrator is the commission of "a life-endangering act." (*Id.* at p. 712.) By "life-endangering act," the court meant an act for which the natural and probable consequences are dangerous to human life and proximately caused death. (*Id.* at p. 713, fn. 27.) To be culpable as a direct aider and abettor of implied malice murder, the accomplice "must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Id.* at p. 713.) Thus, the aider and abettor's actus reus "includes whatever acts constitute aiding the commission of the life-endangering act."

18

(*Ibid.*)  "The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the [life-endangering] act, intent to aid the perpetrator in the commission of the [life-endangering] act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life."  (*Ibid.*)

*Powell* further recognized that Senate Bill No. 1437 did not abolish second degree murder liability under this theory, although it did so under a natural and probable consequences theory.  "That one may intentionally aid a perpetrator in doing an act when he or she knows the act naturally and probably will cause death and consciously disregards this probable result was recognized by our high court in *Gentile, supra,* 10 Cal.5th 830.  In distinguishing liability under the natural and probable consequences doctrine, the court in *Gentile* stated that 'an aider and abettor need not personally possess malice, express *or implied*, to be convicted of second degree murder under a natural and probable consequences theory.' [Citation.]  This language clearly suggests an aider and abettor can be liable for implied malice murder as a theory independent of the natural and probable consequences doctrine.  Later in the opinion, after referencing direct aider and abettor liability for an express malice murder, the *Gentile* court went on to note that ['notwithstanding . . . [the] elimination of natural and probable consequences liability for second degree murder,'] 'an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct

19

endangers the life of another and acts with conscious disregard for life.' " (*Powell, supra,* 63 Cal.App.5th at p. 713 & fn. 29.)

We agree with *Powell* that SB 1437 did not abolish second degree murder liability under a theory of aiding and abetting with implied malice. Bartholomew contends that the statement from *Gentile* relied on by *Powell* is merely dicta, but our high court's " 'dicta generally should be followed, particularly where the comments reflect the court's considered reasoning.' " (*People v. Tovar* (2017) 10 Cal.App.5th 750, 759.) Thus, even assuming our high court's statement was dicta, we agree with other appellate courts that "the *Gentile* court's observation, in effect, recognizing the validity of aiding and abetting implied malice murder, was reflective of 'considered reasoning,' and it was persuasive and should be followed." (*Glukhoy, supra,* 77 Cal.App.5th at p. 589.)

We also reject Bartholomew's argument that this implied malice theory "is an invalid work-around of the now prohibited natural and probable consequences theory of murder." Again, courts have rejected similar arguments. (See, e.g., *Glukhoy, supra,* 77 Cal.App.5th at p. 590; *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 503–504; *Powell, supra,* 63 Cal.App.5th at pp. 711–713.) "[U]nder the natural and probable consequences doctrine, the prosecution was not required to prove the mental state required for implied malice." (*Glukhoy,* at p. 590.) By contrast, as *Powell* carefully explained, direct aiding and abetting of an implied malice murder is based on "the aider and abettor's own mens rea." (*Powell,* at pp. 712–713.)

20

Emphasizing the point, *Powell* added that the requisite intent "must be personally harbored by the direct aider and abettor" and consists of "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." (*Id.* at p. 713, italics omitted.) *Powell* is entirely consistent with *Gentile* in basing an aider and abettor's murder liability on a higher degree of culpability (subjective awareness and conscious disregard of the risk of death) than the now-invalid natural and probable consequences theory of aiding and abetting murder.

3. *Sufficiency of the Evidence*

Having joined our sister courts in finding that the theory of aiding and abetting implied malice murder remains viable, the next question is whether the prosecution proved beyond a reasonable doubt that Bartholomew could still be convicted of implied malice murder as an aider and abettor. As discussed below, on this issue we conclude that it is appropriate to remand the case to the trial court to clarify its findings.

Second degree murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a); *Vargas, supra,* 84 Cal.App.5th at p. 953.) Malice may be express or implied. (§ 188, subd. (a)(1)–(2).) Malice is express when there is manifested an intent to kill. (§ 188, subd. (a)(1); *Vargas,* at p. 953.) " 'Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious

21

disregard for the danger to life that the act poses.' " (*Ibid.*) A finding of implied malice depends upon a determination that the defendant subjectively appreciated the risk involved and may be proven by circumstantial evidence. (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.)

We begin with the actus reus element of implied malice. (See *Powell, supra,* 63 Cal.App.5th at p. 713 [accomplice must, by words or conduct, aid the commission of the life-endangering act].) Bartholomew concedes that he helped shackle and tape Gaines, shot him with BBs, and injected him with liquid.[3] He argues, however, that the life-endangering act was White's "sudden" and "unexpected" slicing of Gaines's neck, and that because there is no dispute that this specific act was, indeed, sudden and unexpected, no substantial evidence could support a finding that Bartholomew acted with the intent to aid it. But this argument conflates the actus reus and mens rea elements of the offense. Putting aside what Bartholomew knew of White's intent, if nothing else, by taping and shackling Gaines, Bartholomew helped prevent Gaines from escaping and facilitated White's killing of him, which satisfies the actus reus element of the offense.

We turn, then, to mens rea. As an initial matter, we disagree with Bartholomew's argument that he would necessarily

_____

[3] Bartholomew's brief states that the liquid was water. The trial court noted that there was "some ambiguity as to who exactly did the cuffing and shackling," but that there was nonetheless some evidence that both Murdock and Bartholomew "participated" in it.

lack the requisite mental state simply because he did not know the specific means by which White would kill Gaines, or because the particular moment at which it occurred was unexpected. Assuming Bartholomew knew that White intended to kill Gaines, he could have believed he was facilitating that eventual act—however and whenever it would take place—by following White's instructions to silence and restrain the victim. The question is therefore what Bartholomew knew of White's intent.

The trial court identified several facts to support its conclusion that Bartholomew had the requisite mental state. First, when White arrived at the tent with Gaines, White told Bartholomew and Murdock that Gaines had gotten him fired and that they were going to "take care" of him that night. Second, Bartholomew knew that White had been violent in the past, not only because he had raped both Bartholomew and Murdock, but also because he told them that he had stabbed someone in the neck over a relatively minor dispute. Third, at White's request, Bartholomew brought him his .22-caliber rifle and bullets, heard White tell Gaines that it would be the gun that kills him, and saw Gaines initially laugh only to realize that White was serious. All of this occurred before Bartholomew and Murdock hit Gaines with sticks at White's direction, cuffed and shackled him, taped his mouth, shot him with BBs, and injected him with liquid that could have been "some type of poison or possibly water." The trial court also pointed to two things that occurred just prior to White slicing Gaines's neck: White said that Gaines had to

23

perform oral sex on Murdock and Bartholomew "if he wants to live," and Bartholomew voted that Gaines should be killed.

Bartholomew contends that these events do not constitute substantial evidence that he possessed the mental state for implied malice. He argues, in effect, that the evidence is not "solid" because it does not compel the conclusion that he knew White intended to kill Gaines. For example, he argues that the phrase "take care of" is ambiguous (particularly where White had a history of "taking care" of boys by beating and raping them but not killing them), and that the fact that Gaines ultimately believed White was not kidding about the gun does not mean Bartholomew reached the same conclusion. But these arguments impose too high a standard for substantial evidence review; they do not establish that the trial court could not reasonably have drawn from this evidence the inferences that it did. Bartholomew's brief also misreads the record when referring to the statement that Gaines needed to perform oral sex if he wanted to live, incorrectly characterizing it as a statement "that White intended to rape the victim, which is what happened" after the statement was made. In fact, the statement referred to performing oral sex on Murdock and Bartholomew, and was made after White had raped Gaines. Presumably the trial court meant that Bartholomew could infer that Gaines would not live if he did not do as White instructed, at least assuming that Bartholomew believed White was serious.

However, Bartholomew points out that the trial court apparently credited evidence that Bartholomew believed White

was playing "head trips."  We repeat the relevant portion of the court's ruling:  "It seems clear to [*sic*] Mr. Bartholomew thought that the—while he thought that Mr. White might have been kidding or playing head trips, et cetera, that the—ultimately, the two men, Mr. Murdock and Mr. Bartholomew, said because the victim had done something to Mr. White that crossed him, that he had to go.  And I think that looking at it in the context of everything that was said, Mr. Bartholomew was aware that he was voting yes, that the decedent should be killed, even if he was not completely sure that this wasn't just one of Mr. White's head games."

With respect to the vote itself, the trial court's finding appears contrary to its conclusion that Bartholomew possessed the requisite mental state under a standard that requires proof beyond a reasonable doubt.  To be convicted as an aider and abettor under an implied malice theory, the defendant must "*know*[] that his or her conduct endangers the life of another" as well as "act [] with conscious disregard for life."  (*Gentile, supra*, 10 Cal.5th at p. 850, italics added.)  A "conscious disregard for life" requires that "the defendant subjectively appreciated the risk involved."  (*People v. Butler* (2010) 187 Cal.App.4th 998, 1008.)  Bartholomew's "aware[ness] that he was voting yes" is therefore not sufficient by itself, and if he believed he was voting yes as part of a "head trip" to terrify Gaines, then it cannot be said he knew and subjectively appreciated that his conduct endangered Gaines's life.

25

We also do not read the trial court's statement that Bartholomew "thought that Mr. White might have been playing head trips" to refer *only* to the vote that immediately preceded the killing. Not only did the court refer in the plural to "head trips," but the same evidence the court credited indicated that Bartholomew held this belief throughout the ordeal until White "unexpectedly" sliced Gaines's neck. In his 1984 interview with Bartholomew, Falzon asked, "You thought he was playing a head trip at this time, still?" and Bartholomew responded affirmatively, bringing up the fact that, after White had Bartholomew and Murdock inject Gaines with what appeared to be lice killer, White said it was just water. So, Bartholomew said, "I still thought he was kidding." Similarly, at the hearing, Falzon was asked whether Bartholomew thought White was playing "head games" or "was actually kidding, with regard to this drastic killing," and he replied, "Of course these young boys would think he was kidding. They had never seen anything like this." Because the evidence that Bartholomew thought White was kidding or playing head trips was not limited to the vote, and because the trial court did not say it was not crediting part of it (and we discern no apparent basis for such line-drawing), we cannot conclude that the trial court's finding was so limited.

Finally, a conviction cannot be premised on the trial court's qualifications that Bartholomew thought White "*might* have been kidding or playing head trips," or "was not *completely* sure" that it was not a head game. "[A]n aider and abettor's mental state must be at least that required of the direct perpetrator." (*People*

26

*v. McCoy* (2001) 25 Cal.4th 1111, 1118; *Gentile, supra*, 10 Cal.5th at p. 845.) "What this means here, when the charged offense and the intended offense—murder or attempted murder—are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*McCoy*, at p. 1118; see *Gentile*, at p. 850.) The uncertainty posited by the trial court, even though qualified, undermines a conclusion that Bartholomew knew and shared White's murderous intent, and would indicate that he had a mental state "less culpable than that of the actual perpetrator." (*McCoy*, at p. 1118.) Bartholomew's conviction as an aider and abettor would not be permissible in that circumstance.

Based on the record before us, we cannot foreclose the possibility that the trial court erred by relying on this uncertainty to conclude that the prosecution carried its burden to establish beyond a reasonable doubt that Bartholomew was guilty as an aider and abettor of implied malice murder. The court did not explain how it reconciled the evidence it credited of Bartholomew's subjective uncertainty about whether White was playing head games with the evidence from which it inferred that Bartholomew knew White was serious.[4] Under these

---

[4] While we reject Bartholomew's argument that evidence cannot be substantial where it allows for more than one conclusion, we agree that the evidence the court identified is not necessarily inconsistent with the possibility that Bartholomew believed White was playing head games. Moreover, while the court stated that, later in the interview with police, Bartholomew

circumstances, a remand is warranted so that the court can clarify its findings and evaluate its ruling under the standards we have articulated.[5]

### 4. *Bartholomew's Youth*

Bartholomew's final argument is that the trial court failed to meaningfully consider his youth, and, in particular, the factors that a court must consider when deciding whether to sentence a juvenile to life without parole (LWOP) under *Miller v. Alabama*

---

"indicated that he and Murdock agreed to kill the victim," it appeared to be referring to Bartholomew's garbled response to the questions, "Why did [White] say he killed [Gaines]?" "Why did [White] tell you that he killed [Gaines]?" "Why did he kill [Gaines]? Why did the three of you kill [Gaines]?" The Attorney General does not reference this finding in arguing that the trial court's decision is supported by substantial evidence, and even assuming we could find the exchange susceptible to the trial court's construction, it is not clear that Bartholomew was describing a before-the-fact agreement to kill Gaines, particularly in light of the questions to which he was responding.

[5] It may be that Justice Brown, in her dissenting opinion, has correctly discerned the trial court's intent, but we do not consider it unduly burdensome under the circumstances to remand for clarification. Justice Brown expresses concern that by doing so we create a perverse incentive for trial judges to conceal their reasoning, on the assumption that their goal is to render their decision "bullet-proof" on appeal. We hope not to create such an incentive, and that the value of giving reasons is evident enough and important enough to outweigh the burden associated with this limited remand. We trust that our colleagues on the trial bench will recognize the importance of clarity to doing justice and will not engage in "strategic" withholding—from convicted defendants, and from the public—of the reasoning behind the profoundly consequential choices that so often must be made in criminal sentencing.

(2012) 567 U.S. 460, in violation of the Eighth and Sixth Amendments.

Framed as a violation of his rights under the Eighth and Sixth Amendments, Bartholomew's claim is unconvincing. The Eighth Amendment prohibits cruel and unusual punishment and encompasses the "foundational principle" that the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children. (*Miller v. Alabama*, *supra*, 567 U.S. at p. 474.) Given the constitutional significance of youth, the United States Supreme Court has derived "a number of limitations on juvenile sentencing: (1) no individual may be executed for an offense committed when he or she was a juvenile [citation]; (2) no juvenile who commits a nonhomicide offense may be sentenced to LWOP [citation]; and (3) no juvenile who commits a homicide offense may be automatically sentenced to LWOP." (*People v. Franklin* (2016) 63 Cal.4th 261, 273–274.) Under *Miller*, a court deciding whether to sentence a juvenile to LWOP must consider evidence regarding " 'a juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences" ' [and] ' "the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional." ' " (*In re Kirchner* (2017) 2 Cal.5th 1040, 1048.)[6] But Bartholomew

---

[6] The sentencing court must also consider the circumstances of the homicide offense, including the extent of the juvenile's participation in the conduct and the way familial and

does not show a violation under the Eighth Amendment jurisprudence upon which he relies because the court here was deciding whether he could be found liable for murder under current law (hence whether he qualified for the leniency afforded by section 1172.6), not whether he should receive LWOP. And Bartholomew forfeited any claim that the court violated his rights under the Sixth Amendment by failing to provide any argument, analysis, or support therefor. (See Cal. Rules of Court, rule 8.204(a)(1); *County of Butte v. Emergency Medical Services Authority* (2010) 187 Cal.App.4th 1175, 1196, fn. 7.)

Bartholomew's challenge would have been more aptly framed as a substantial evidence challenge, given his reliance on *In re Moore* (2021) 68 Cal.App.5th 434, 453, which held that youth is a factor to consider when assessing whether a defendant acted with reckless disregard for human life under a felony murder theory. (See also *In re Harper* (2022) 76 Cal.App.5th 450, 470–472 [determining 16-year-old offender acted with a reckless disregard for human life despite youth]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991 ["A juvenile's immaturity and failure to appreciate the risks and consequences of his or her actions bear directly on the question whether the juvenile is subjectively ' "aware of and willingly involved in the violent manner in which

_____

peer pressures may have affected him; whether the juvenile might have been charged with and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; and the possibility of rehabilitation. (*In re Kirchner, supra,* 2 Cal.5th at p. 1048.)

the particular offense is committed" ' and has 'consciously disregard[ed] "the significant risk of death his or her actions create" ' "].)

Under *Moore*, youth is a factor that should be considered along with the other *Clark*[7] factors when assessing whether substantial evidence supports a determination that a defendant acted with reckless disregard for human life under a felony murder theory. (*In re Moore, supra*, 68 Cal.App.5th at p. 453.) There, the defendant participated in a car theft and was present when a codefendant got out of the car and robbed a couple in a parking lot. (*Id.* at p. 440.) After the couple handed over their valuables, the codefendant, without provocation, shot and killed one of the victims. (*Ibid*.) The court held that, even if the evidence in the case had been sufficient to "support[] a finding of reckless indifference for an adult, it is not sufficient to establish that Moore, who was 16 at the time of the shooting, had the requisite mental state." (*Id.* at p. 453.) It reasonably found that the 16-year-old defendant "lacked ' "the experience, perspective, and judgment" ' to adequately appreciate the risk of death posed by his criminal activities." (*Id.* at p. 454.)

---

[7] *People v. Clark* (2016) 63 Cal.4th 522, 618–623, set out a nonexhaustive series of considerations relevant to determining whether a defendant acted with reckless indifference to human life under section 190.2, subdivision (d) and 189, subdivision (e), including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks.

Here, the trial court likewise considered Bartholomew's youth, referring to young people's "lack of development, their lack [of] cognition in some of their decision making." Bartholomew argues that the trial court should have expressly considered the impact on his mental state of youth factors like immaturity, heedless risk-taking, vulnerability to negative influences and outside pressures, and children's limited ability to control their own environment and extricate themselves from horrific, crime-producing settings, as well as the facts that Bartholomew was "under the control of a psychopath," had only a seventh-grade education, and had lived on the streets since he was 13 years old.

While the trial court's discussion of Bartholomew's youth was brief, the brevity of the analysis alone would not furnish a basis to conclude that the court's consideration of this issue was insufficient. But we need not address Bartholomew's arguments at length in light of our decision to remand the case so the trial court can clarify findings that pertain to Bartholomew's mental state.[8] In so doing, the court may articulate any additional reasoning it deems appropriate of whether and how Bartholomew's youth bears on its determination whether Bartholomew knew and shared White's murderous intent, and subjectively appreciated the risk his actions posed to Gaines's life.

---

[8] For example, when Falzon explained why he believed Bartholomew thought White was kidding, he pointed to Bartholomew's youth and inexperience.

## DISPOSITION

The judgment is reversed in part and the case is remanded to the trial court with directions to clarify its findings and reconsider its ruling under the standards set forth in section 3. ("Sufficiency of the Evidence," *ante* at pp. 18–24.)

GOLDMAN, J.

I CONCUR:

STREETER, J.

**BROWN, Acting P. J., Dissenting**

I join most of the majority's opinion, but respectfully dissent to the majority's view that we should remand for clarification and reconsideration with respect to the sufficiency of the evidence issue presented in this appeal. I would affirm the denial of the Penal Code[1] section 1172.6 petition because substantial evidence supports the trial court's finding that the prosecution proved beyond a reasonable doubt that Bartholomew was guilty of implied malice murder as an aider and abettor.

Our standard of review is well settled, but it bears repeating. On appeal from the denial of a section 1172.6 petition after an evidentiary hearing, we review the trial court's finding that a defendant is guilty of implied malice murder for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is *any* substantial evidence, *contradicted or uncontradicted*, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*, italics added.)

"We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of

_____

[1] All further statutory references are to the Penal Code.

1

fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, *supra*, 75 Cal.App.5th at p. 298.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476.) " ' "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*Ibid.*)

In conducting our review, we do not resolve credibility issues or evidentiary conflicts. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) The trier of fact may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*).) " 'The trier of fact may believe and accept a portion of the testimony of a witness and disbelieve the remainder. On appeal that portion which supports the judgment must be accepted, not that portion which would defeat, or tend to defeat, the judgment.' " (*People v. Thomas* (1951) 103 Cal.App.2d 669, 672; see also *People v. Hill* (1954) 126 Cal.App.2d 378, 380 ["The judge or jury may accept as true a portion of the testimony of a witness, and disbelieve the remainder or have a reasonable doubt as to its correctness"].) Under substantial evidence review, a trial court, sitting as the trier of fact, need not expressly specify which portions of evidence or testimony it believes or disbelieves. (See *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226–227 [all conflicts in evidence and questions of credibility are resolved in favor of verdict]; *Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257 ["[A]bsent an express

2

credibility finding, we must infer the trial court resolved questions of credibility in a manner that supports its findings and order"].)

Here, the court denied Bartholomew's petition with a brief minute order: "Petition for resentencing pursuant to P[enal] C[ode] [section 1172.6] is DENIED." After citing *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) and numerous other cases, the court used similarly unambiguous words when orally announcing its decision: "[T]he court does find that Mr. Bartholomew did act with implied malice. That he acted with the knowledge of Mr. White's unlawful intent, and that he did intend to assist William White toward Mr. White's unlawful ends. [¶] The Court finds that Mr. Bartholomew knew his conduct and danger of [*sic*][2] the decedent and that Mr. Bartholomew acted with conscious disregard for that life. [¶] So the motion filed by Mr. Bartholomew, pursuant to [section 1172.6] is denied, and that's the Court's ruling."

In my view, the court's ruling that Bartholomew was guilty of implied malice murder was both clear and supported by substantial evidence. Viewing the life-endangering act as White's final attack on Gaines, I agree with the majority that evidence of the shackling and gagging sufficiently supports the actus reus element for aiding and abetting implied malice murder, as, I believe, does Bartholomew's vote that Gaines should die. I also

_____

[2] Here, the court likely said, "Bartholomew knew his conduct *endangered* the decedent and that Mr. Bartholomew acted with conscious disregard for that life."

agree with the majority's observation that the court recited "several facts" to support its conclusion that Bartholomew acted with the requisite mens rea. Those recited facts, including White's statements about killing Gaines and Bartholomew's own actions, statements, and knowledge of White's violent nature, provide substantial evidence in support of the court's ruling. Under the applicable standard of review, that should be the end of our analysis.

It seems the majority would agree with the conclusion that substantial evidence supports the trial court's denial of the section 1172.6 motion, but for concern about the court's oral comments with respect to Bartholomew's statement regarding a "head trip" or "head trips." I turn then to these comments, as they provide no cause for remand.

The pertinent language is as follows: "Much has been made, and understandably by both parties, regarding *the vote* about whether or not the decedent should live. There's certainly arguments both ways that the—it was ambiguous as to whether it was thumbs up or thumbs down, but I think at some point it's not a [*sic*] much moment. Clearly, there was a discussion later on whether it was thumbs up or thumbs down. [¶] *It seems clear to* [sic] *Mr. Bartholomew thought that the—while he thought that Mr. White might have been kidding or playing head trips, et cetera, that the—ultimately, the two men, Mr. Murdock and Mr. Bartholomew, said because the victim had done something to Mr. White that crossed him, that he had to go.* And I think that looking at it in the context of everything that was said,

4

*Mr. Bartholomew was aware that he was voting yes, that the decedent should be killed, even if* he was not completely sure that this wasn't just one of Mr. White's head games. [¶] As I noted, *later on in his interview Mr. Bartholomew indicated that he and Murdock agreed to kill the victim*, because the victim had crossed and was trying to hurt Mr. White by this incident that got him fired." (Italics added.)

The majority repeatedly assumes that, by these comments, the trial court "credited" Bartholomew's statement that he believed White was playing head trips. The majority then seems to conduct its own, independent review of the evidence and concludes that the evidence that Bartholomew thought White was playing a head game "was *not* limited to the vote," (italics added)—notwithstanding that the trial court's two comments about the head trips (or "head games") were interspersed between two references to the vote. From there, the majority asserts that "the evidence the court identified [supporting its conclusion] is *not necessarily inconsistent with the possibility* that Bartholomew believed White was playing head games," discounting as "garbled" Bartholomew's admission that "that's why we killed [Gaines], because [White] said [Gaines] hates me, you know, and tried to hurt me, you know, so [White] said what do you want to do with him? We [Murdock and Bartholomew] said *well he can't be here if he wants to hurt you*, you know, because he told us that, you know, to always protect him no matter what."

In contrast to the majority, I do not read the court's comments about head trips as "crediting" Bartholomew's

5

statement that he thought White was playing a head trip, particularly given that the court stated that "even if" Bartholomew thought White "might have been kidding," that "ultimately the two men, Mr. Bartholomew and Mr. Murdock *said because the victim had done something to Mr. White that crossed him, that he had to go*." (Italics added.) Far from "crediting" Bartholomew's statement about "playing a head trip," the trial court expressly concluded: "And I think that *looking at it in the context of everything that was said,* Mr. Bartholomew was aware that he was voting yes, that the decedent should be killed*, even if* he was not completely sure that this wasn't just one of Mr. White's head games." (Italics added.) Immediately after this statement, the court reiterated, "As I noted, later on in his interview Mr. Bartholomew indicated that *he and Murdock agreed to kill the victim*, because the victim had crossed and was trying to hurt Mr. White by this incident that got him fired." (Italics added.) By its use of the phrases "even if," "looking at it in the context of everything" and stating its finding that "ultimately" Bartholomew and Murdock decided the victim "had to go," I believe the court was not *crediting* Bartholomew's comments about his belief that White was playing a head trip (or head trips). Rather, coupled with its repetition of evidence that Bartholomew had agreed that the victim should be killed, the court's comments are more reasonably read as *discounting* Bartholomew's head trip statements and concluding that overall, in the context of everything Bartholomew knew, saw, heard, and did, the prosecution had presented proof beyond a reasonable

6

doubt of Bartholomew's mens rea and concomitant guilt for implied malice murder, notwithstanding Bartholomew's comments about White's mind games.

Based on its assumption that the trial court was "crediting" Bartholomew's head trip comments, as well as its independent reading of the 1984 interview to opine that Bartholomew's statements were not limited to the vote, the majority finds a need for remand to "eliminate any doubt about the possibility of error" and to "foreclose the possibility" of error. The majority thus turns what it acknowledges as the applicable standard of review—substantial evidence—on its head. Although it recognizes that we must examine the record in the light most favorable to the judgment and that our job on review is merely to determine whether there is any substantial evidence, contradicted or uncontradicted, to support the trial court's decision, the majority disregards the substantial evidence it acknowledges the trial court identified supporting its ruling and seemingly invents a new standard for appellate review: Regardless of the clarity of a trial court's final ruling and the undisputed existence of substantial evidence supporting it, a trial court's *explanation* on the way to its ultimate conclusion must "eliminate any doubt about the possibility of error" and "foreclose the possibility" of error.

But we review a trial court's order, not its oral comments leading up thereto. (Cf. *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450–1451 (*Whyte*) ["Because we review the correctness of the order, and not the court's reasons, we will

7

not consider the court's oral comments or use them to undermine the order ultimately entered"].) Again, the court's final determination could hardly be more clear: "But weighing it all out and applying the standard, whether or not the People have satisfied the burden beyond a reasonable doubt, the Court does find that Mr. Bartholomew did act with implied malice. That he acted with the knowledge of Mr. White's unlawful intent, and that he did intend to assist William White toward Mr. White's unlawful ends. [¶] The Court finds that Mr. Bartholomew knew his conduct and danger of [sic] the decedent and that Mr. Bartholomew acted with conscious disregard for that life. So the motion filed by Mr. Bartholomew, pursuant to [section 1172.6] is denied, and that's the Court's ruling." I therefore disagree that we need to remand so that the trial court can "clarify its findings" and "evaluate its ruling under the standards [the majority] discusse[s]." The majority does not contend that, in announcing this ruling, the trial court misunderstood the burden of proof under section 1172.6 or the applicable legal principles under *Powell,* nor could it. The trial court's straightforward order embodies its determination that Bartholomew is guilty of implied malice murder, and its final ruling denying the section 1172.6 motion is what we review for substantial evidence. (*Clements,* *supra,* 75 Cal.App.5th at p. 298.) Because there is substantial evidence supporting that ruling—as the majority concedes when it acknowledges that "the trial court identified evidence supporting its conclusion"—I believe our decision should be a simple affirmance.

8

My conclusion is reinforced by the fact that section 1172.6 does not require a trial court to prepare a statement of decision or a written or oral statement explaining its reasoning following an evidentiary hearing, nor does it require written or oral findings of fact. (Contra § 1172.6, subd. (c) [requiring statement of reasons for denial at prima facie stage].) Under such circumstances, the court's oral comments should not be used to undermine its ruling, including its ultimate factual findings in support thereof, or to argue that the court did not mean what it said in the order entered. (Cf. *Whyte, supra,* 101 Cal.App.4th at p. 1451 ["[R]eviewing the trial court's oral comments would in effect require the trial court either to prepare a statement of decision where none is required or to say nothing during argument to avoid creating grounds for impeaching the final order. We decline to place the trial courts in such an untenable position"].) The majority's decision to remand for clarification creates a perverse incentive for trial judges: Trial judges—though certainly not litigants—will be better off if they simply enter orders denying all petitions and motions, rather than discussing the evidence and the reasoning underlying their conclusions.[3]

Moreover, the comments the majority uses to reverse do not manifestly contradict the court's conclusion that Bartholomew

---

[3] Indeed, this trial court on remand would render its ruling bullet-proof by vacating its prior oral ruling and stating no more than, "The petition for resentencing pursuant to section 1172.6 is denied." In the event of a third appeal in this matter, the majority would surely have to agree (again) that there is substantial evidence in the record to support such a ruling.

9

knew of White's unlawful intent and that his conduct endangered Gaines's life. Contrary to the majority's assumption, the court never impliedly or expressly "credited" Bartholomew's statements that he thought White was *actually* playing head games. As explained previously, considering the court's final ruling, if anything, the court's comments can (and should) reasonably be read as discounting or expressing doubt as to the credibility of Bartholomew's statements about White's game-playing.[4]

Additionally, and contrary to the majority, when referring to Bartholomew's uncertainty, I believe the trial court was discussing only the vote. After addressing at least ten other pieces of evidence supporting its conclusion that Bartholomew "act[ed] as an aider and abettor with implied malice," the court introduced the topic of "the vote"; discussed the ambiguity as to "whether it [the voting mechanism] was thumbs up or thumbs down"; stated that White, Murdock, and Bartholomew clearly

---

[4] I also believe the majority misinterprets the record when it finds a "possibility that the trial court erred by relying on this uncertainty"—meaning Bartholomew's uncertainty about White's intentions—"to conclude that the prosecution carried its burden to establish beyond a reasonable doubt that Bartholomew was guilty as an aider and abettor of implied malice murder." I disagree that the trial court *relied* on Bartholomew's stated uncertainty to support its conclusion. Fairly read, the trial court's comments indicate that it *minimized* Bartholomew's stated uncertainty and found that such statements, "ultimately" and "in the context of everything that was said," did not outweigh all the other evidence of Bartholomew's culpability, including, of course, his statement to Falzon that "he and Murdock agreed to kill the victim, because the victim had crossed and was trying to hurt Mr. White."

10

discussed whether to kill Gaines; found that Bartholomew and Murdock ultimately said that Gaines "had to go" because he had crossed White; and concluded that "looking at it in the context of everything that was said, Mr. Bartholomew was aware that he was *voting yes*, that the defendant should be killed, *even if* he was not completely sure that this wasn't just one of Mr. White's head games." (Italics added.) In my view, when the court used the phrases "looking at *it* in the context . . .[,]" and "not completely sure that *this* wasn't just one of Mr. White's head games," the court's references to "it" and "this" are reasonably read to mean only the vote, not the entire evening. To infer that the trial court found that Bartholomew was uncertain regarding White's intent throughout the night when the court never expressly so found, and when both the court's immediately subsequent comments (that "he and Murdock agreed to kill the victim") and final ruling refute such a finding, is contrary to our standard of review. Furthermore, even if it were appropriate for the majority to make an independent determination on appeal that the only reasonable reading of Bartholomew's 1984 interview is that he believed White was playing a head game throughout the entire evening, that new assessment of the evidence could warrant remand only if (1) the trial court fully credited Bartholomew's statement, which it did not; and (2) we disregard all other contrary evidence supporting the denial of the section 1172.6 motion, including Bartholomew's knowledge of White's repeated statements that Gaines was going to die and Bartholomew's above-described statement in the same 1984 interview, "that's why we killed

11

[Gaines], because [White] said [Gaines] hates me, you know, and tried to hurt me, so [White] said what do you want to do with him? We said *well he can't be here if he wants to hurt you*." (Italics added.) Faithful adherence to the substantial evidence standard of review should preclude us from this unprecedented remand for clarification.

The majority disagrees that the court's statement that Bartholomew " 'thought that Mr. White might have been playing head trips' [ ] refers *only* to the vote," and finds such disagreement merits reversal. However, their rationale is unpersuasive. The majority relies first on the appearance of the plural term "head trips," versus "head trip" in the reporter's transcript. But there are at least seven typographical errors in this transcript, as can readily be seen in this opinion's recital of the court's comments. The presence of "head trips" in a reporter's transcript replete with typographical errors is not a convincing ground for reversal, especially considering the context in which the phrase appears and the court's ultimate order. While discerning meaning from the use of a plural may be appropriate when conducting de novo review of a legislative enactment, it is a thin reed on which to divine an infirmity in an error-riddled transcript of a busy trial court's oral ruling.

The majority also unpersuasively reasons that the court's statement was not limited to the vote because (1) "the same evidence the court *credited*" included statements indicating that Bartholomew held the belief that White was kidding throughout the ordeal; and (2) the court did not expressly discredit those

12

statements. The evidence the majority refers to as "credited" is Bartholomew's 1984 interview, wherein he first said that he did not think that White was serious following what reasonably can be inferred to be Bartholomew's description to Falzon of White telling Murdock and Bartholomew that, by their vote, they had just sentenced a man (Gaines) to die. Again, given the ruling, I do not believe the court "credited" the belief that White was in fact playing a head trip, and the trial court certainly did not make an express finding that Bartholomew *actually* believed that White was kidding at any point. Furthermore, on substantial evidence review, the court was not required to expressly state that it credited some, but not all of a witness's testimony. (See *People v. Thomas*, *supra*, 103 Cal.App.2d at pp. 672–673.) We must presume the court's order is correct and draw all reasonable inferences in support thereof. (*People v. Mays* (2007) 148 Cal.App.4th 13, 33.) Contrary to our proper appellate role on substantial evidence review, the majority instead seems to draw inferences to undermine the trial court's decision, rather than indulging all intendments in favor of the ruling's correctness. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

The majority also fails to adhere to the applicable standard of review with its apparent determination that the trial court could not reasonably have concluded Bartholomew thought White might have been playing a head game solely with respect to the vote. The majority "discern[s] no apparent basis for such line-drawing" given Bartholomew's 1984 interview and Falzon's testimony that "of course these young boys would think [White]

13

was kidding." The trier of fact, however, may believe or disbelieve uncontradicted testimony where there is any rational ground for doing so. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582; *People v. Thomas*, *supra*, 103 Cal.App.2d at p. 672.) Like all suspects, Bartholomew was indisputably an interested witness with a motivation to minimize his own culpability, and nothing in the record suggests that the court believed Bartholomew thought that White was actually playing a head game throughout. Given the evidence before the court, including Bartholomew's description of White requiring Murdock to watch the killing because "[t]his is what you decided," the court could rationally conclude Bartholomew knew of White's unlawful intent to take a life-endangering act, yet harbored some doubt as to whether his own vote had in fact sealed Gaines's fate. As for Falzon, his foundationless, speculative opinion regarding his personal view of Bartholomew's mental state is irrelevant to our substantial evidence review, and the trial court was certainly not required to adopt his view as its own. Indeed, it is curious that the majority emphasizes this part of Falzon's testimony, while at the same time omitting any mention of his testimony that White told Bartholomew and Murdock that they had "just sentenced a man to die."

Finally, I would affirm for the additional reason that the yes-vote to kill Gaines constituted a life-endangering act under the circumstances. This vote was taken after White, an extremely violent individual who had bragged of recently stabbing a man in the throat, voiced his grudge against Gaines,

14

stated they would "take care" of Gaines that evening, and indicated twice that he would kill Gaines. Gaines initially laughed upon hearing the first death threat, but "then he seen [White] was serious and stopped laughing." Prior to the vote, at White's direction, Gaines had been shackled, gagged, beaten, and tortured, and White had raped him. The natural and probable consequences of the yes-vote in these circumstances were dangerous to human life. (Cf. *Clements*, *supra*, 75 Cal.App.5th at p. 299 [defendant's act of requesting and coordinating assault on decedent by violent ex-husband who threatened to kill decedent supported finding of guilt for implied malice murder].) Substantial evidence shows Bartholomew intentionally engaged in and assisted the yes-vote, and the trial court did not render a finding that Bartholomew believed White was playing head games during this vote or throughout the night. Moreover, even if the court believed that Bartholomew was not 100 percent certain that White intended to kill Gaines, the evidence is nonetheless sufficient to support the inference that Bartholomew was subjectively aware of the risk to Gaines's life and consciously disregarded that risk. (Cf. *Clements*, at p. 300.) "[I]mplied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143 [court erred in ruling implied malice requires subjective awareness that conduct had a high probability of resulting in death].)

At the end of the day, the majority states that it is remanding for the trial court to re-evaluate its ruling under the

15

"standards [the majority] discusse[s]." But the trial court did not apply the wrong legal standards. The legal standards discussed by the majority are the same as those set forth by the trial court, and no party contends otherwise. Applying those standards, the court concluded that Bartholomew was ineligible for relief. The only new "standard" announced by the majority appears to be one requiring the trial court to convince us that there is not even a possibility of infirmity in its reasoning, despite the lack of an express finding establishing any such infirmity. I cannot agree with this approach to substantial evidence review.

In sum, the trial court's conclusion that Bartholomew committed implied malice murder as an aider and abettor is supported by the record. On substantial evidence review, we should not engage in any independent assessment of the record and the relative credibility of conflicting statements, nor should we flyspeck the court's oral reasoning to undermine an unambiguous final order denying the petition. Because there is no basis to remand for clarification, I would affirm the denial of the section 1172.6 petition. Respectfully, I dissent.

BROWN, Acting P. J.

16